No. 92,580

STATE OF KANSAS, *Appellee,* v. BILLY ANDERSON, *Appellant.*
(136 P.3d 406)

Opinion filed June 9, 2006.

*Philip R. White,* of Ariagno, Kerns, Mank & White, L.L.C., of Wichita, argued the cause and was on the briefs for appellant.

*Leslie A. Isherwood,* assistant district attorney, argued the cause, and *Charles L. Rutter,* assistant district attorney, *Nola Tedesco Foulston,* district attorney, and *Phill Kline,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This appeal arises on the State's petition for review of a Court of Appeals decision suppressing drug evidence against defendant Billy D. Anderson. *State v. Anderson,* 34 Kan. App. 2d 375, 119 P.3d 1171 (2005). We must decide whether probable cause supported Anderson's warrantless arrest or, in the alternative, whether an oral arrest and detain order for violation of conditional release was sufficient to take Anderson into custody under K.S.A. 2005 Supp. 75-5217(a).

The largely undisputed and legally relevant facts are the following.

A Wichita police officer, conducting nighttime surveillance from an unmarked car, observed Anderson driving a rental truck to an Amoco convenience store/gas station known as a hub of illegal drug activity. Anderson was wearing gang colors, and his passenger was a known gang member. After 5 minutes inside the store, Anderson and his passenger left the store and drove away. The officer followed their truck to the parking lot of an apartment complex, where four men briefly approached the truck. The truck then left the parking lot and returned to the store.

Anderson went into the store again and emerged with a different passenger, Cornell Golston. Again, the officer followed the truck as it exited the store. The officer observed Anderson commit two traffic violations, and the officer radioed his partner in a marked car to make a traffic stop.

Three officers initially participated in the stop. One of them had stopped Anderson on two previous occasions, suspecting drugs but finding none after Anderson refused permission to search the vehicle. That officer also was aware that narcotics officers were in-

vestigating Anderson's activities, and, on an earlier stop, had discovered he was carrying $4,000 cash. One of the two other officers approached the truck on the driver's side, asked for identification from both Anderson and Golston, and ran their driver's licenses through the Wichita Police Department's Special Police Information Data Entry Retrieval (SPIDER) system. While waiting for a response, he wrote out a citation.

SPIDER advised that both men were "signal 33," meaning documented gang members; it also advised that Anderson was on supervised conditional release. Neither Anderson nor Golston had a warrant, however, and Anderson's driver's license was valid. The officers decided to radio for backup and a K-9 unit to search the truck.

About 35 minutes after the initial stop, two more officers arrived and a police captain arrived. The officer who had written the citation then returned to the truck, asked Anderson to step out, and performed a pat-down search for weapons. Finding nothing, the officer issued a speeding citation and returned Anderson's and Golston's identifications.

After Anderson signed the citation, the officer sought consent to search the truck. Anderson refused it. The officer then informed Anderson that a K-9 unit was on its way and that he and Golston were not free to leave and would have to wait outside the truck. When the officer removed Golston from the vehicle and patted him down, he saw a plastic bag sticking out of Golston's shoe. Golston admitted the bag contained marijuana, and he was arrested. The officer then discovered pills in Golston's other shoe and $1,300 cash in his pocket.

When the K-9 unit arrived, at least one of the officers believed the dog alerted on the truck. An exhaustive search of the truck followed, but it uncovered no additional drugs. During the dog sniff and search, Anderson was kept 30 to 40 feet away from the truck.

The officers then attempted to reach the Kansas Department of Corrections to determine if they could arrest Anderson for violation of his conditional release. After several unsuccessful attempts, the officers roused Richard Sackhoff at home. The officers told

Sackhoff, a special enforcement officer for the Department of Corrections, that Anderson was a gang member on parole who was with another gang member in possession of marijuana. Sackhoff gave the officers oral permission to arrest Anderson based on that information; he said he would issue a written arrest and detain order and would place a copy of it inside the front door of his home so that an officer could pick it up. Sackhoff did so, but the written order was dated the next day.

Armed with Sackhoff's oral permission, the officers attempted to arrest Anderson, who ran. Anderson tried to hide baggies containing pills or powder near a dumpster during flight, but he was quickly apprehended and the baggies found. In the course of Anderson's subsequent successful arrest, the officers also discovered a baggie of pills and powder in one of his shoes. These and the baggies he had tried to hide were later determined to contain methylenedioxymethamphetamine, also known as MDMA or Ecstasy.

Anderson moved to suppress the drug evidence. The district judge heard evidence about the stop and arrest and stated:

"It's undisputed that there was no D and A, detain and arrest warrant. There's no question in my mind that Mr. Sackhoff as a special enforcement officer could issue an order to arrest and detain, even though he was not Mr. Anderson's parole officer. He certainly had the authority to do so based upon the information he was provided with.

"Factually, there's no dispute that the drug sniffing dog came out. The dog's handler . . . says the dog made a hit on the vehicle. A search of the vehicle discovered no drugs in the vehicle.

"It was at that point that the officers began to contact a parole officer to get an arrest and detain order. And they obtained one. . . .

"I don't have any problem with an oral and I don't think there's any problem in the law with an oral authorization, that it exists, once it exists for Mr. Sackhoff to give an oral authorization to the officers to arrest and detain.

"As I say, the real legal question is whether or not the officers who made the car stop and who had the suspicion can rely on that arrest and detain warrant to arrest Mr. Anderson and then search him.

. . . .

"I find factually that [one] officer had a reasonable suspicion to believe that Mr. Anderson was in violation of his parole once he got the information back from SPIDER that Mr. Anderson was on parole. And I find as a matter of law, the fact that there was no . . . arrest and detain order in existence at the time of the stop

does not make it unreasonable for [the officer] to have held Mr. Anderson until such an order existed.

"And I'll overrule the motion to suppress based on that."

When defense counsel asked the judge to clarify whether probable cause to arrest was necessary, the judge continued:

"Does not require probable cause, although, if you go to the arrest and detain, there's probable cause for that. No question in my mind there's probable cause to believe that your client's in violation of his parole. SPIDER—the request from SPIDER or the response from SPIDER that your client's on parole, together with the other information available to [the officer] there's probable cause to believe that he's in violation of his parole. But it's really a reasonable suspicion after the traffic stop."

The judge also said that the initial scope of the stop was not exceeded, that the duration of the stop was reasonable, and that the police did not need to have "physical possession of a written order." There was no evidence presented at the suppression hearing on the actual content of the conditions for Anderson's supervised release.

After a bench trial on stipulated facts, Anderson was convicted of possession of MDMA with intent to sell, contrary to K.S.A. 65-4163(a), and failure to affix a drug tax stamp, contrary to K.S.A. 79-5204.

The Court of Appeals reversed the convictions and ordered the drug evidence suppressed, accepting Anderson's arguments that his detention was unlawful after the search of the truck yielded no drugs, that a police officer is required to obtain a written arrest and detain order authorizing detention of a person accused of violating the terms of his or her conditional release, that there was no other justification for Anderson's arrest, and that the seized drugs therefore constituted fruit of the poisonous tree.

### Standards of Review

The factual underpinnings of a decision on a motion to suppress are reviewed for substantial competent evidence and the ultimate legal conclusion drawn from those facts reviewed de novo. Where, as here, the facts material to the district judge's decision are not in dispute, the question of whether to suppress is purely a question

of law over which an appellate court has unlimited review. *State v. Ramirez*, 278 Kan. 402, 404, 100 P.3d 94 (2004). Moreover, we note that the State bears the burden to demonstrate that a challenged seizure or search was lawful. See *State v. Boyd*, 275 Kan. 271, 273, 64 P.3d 419 (2003) (State bears burden).

This case also requires statutory interpretation or construction, which raises issues of law reviewable de novo on appeal. See *State v. Maass*, 275 Kan. 328, 330, 64 P.3d 382 (2003). We attempt to give effect to the intent of the legislature as expressed. If a statute is plain and unambiguous, we do not determine what the law should or should not be, speculate as to the legislative intent behind it, or read the statute to add something not readily found therein. *State v. de la Cerda*, 279 Kan. 408, 411, 109 P.3d 1248 (2005).

### *Propriety of Traffic Stop and Detention Beyond It*

The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Section 15 of the Kansas Constitution Bill of Rights provides protection identical to that provided under the Fourth Amendment to the United States Constitution. *State v. Morris*, 276 Kan. 11, Syl. ¶ 3, 72 P.3d 570 (2003).

A traffic stop is a seizure within the meaning of the Fourth Amendment. *State v. Slater*, 267 Kan. 694, 696-97, 986 P.2d 1038 (1999); *State v. Mitchell*, 265 Kan. 238, 241, 960 P.2d 200 (1998); *State v. McKeown*, 249 Kan. 506, 510, 819 P.2d 644 (1991). To stop a moving vehicle, an officer must have articulable facts sufficient to constitute reasonable suspicion under K.S.A. 22-2402(1) and *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). *McKeown*, 249 Kan. at 510. A traffic violation provides an objectively valid reason to effectuate a traffic stop, even if the stop is pretextual. See *Whren v. United States*, 517 U.S. 806, 813, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996); *State v. DeMarco*, 263 Kan. 727, 733, 952 P.2d 1276 (1998).

A law enforcement officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he or she is entitled to operate the car, the driver must be allowed to proceed on his or her way, without being subject to further delay by the officer for additional questioning. In order to justify a temporary detention for further questioning or investigation, the officer also must have reasonable and articulable suspicion of illegal transactions in drugs or of another serious crime. *State v. Mitchell,* 265 Kan. at 245; *DeMarco,* 263 Kan. at 734 (citing *United States v. Mendez,* 118 F.3d 1426, 1429-30 [10th Cir. 1997]).

Here, there is no question that the initial traffic stop was valid; Anderson was speeding and had crossed the center line. The issue thus becomes whether the officers had reasonable suspicion of other serious criminal activity to justify the continuation of the stop after Anderson's and Golston's licenses were returned and the citation issued.

*Terry* held that a police officer could stop and frisk an individual without probable cause to believe a crime has been or is being committed if the officer is able to point "to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21. *Terry's* holding was codified in K.S.A. 22-2402(1), which provides:

"Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand . . . the name [and] address of such suspect and an explanation of such suspect's actions."

The United States Supreme Court has explained reasonable suspicion in this way:

"The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch."' [Citation omitted.] The Fourth Amendment requires 'some minimal level of objective justification' for making the stop. [Citation omitted.] That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means 'a fair probability that contraband or evidence of a crime will be found,' [citation omitted], and the level of suspicion required for a *Terry*

stop is obviously less demanding than that for probable cause." *United States v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 109 S. Ct. 1581 (1989).

See *Anderson*, 34 Kan. App. 2d at 385.

This court also has defined reasonable suspicion by contrasting it with probable cause:

" 'Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause . . . . Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture" [citation omitted] that must be taken into account when evaluating whether there is reasonable suspicion.' *Alabama v. White*, 496 U.S. 325, 330, 110 L. Ed. 2d 301, 110 S. Ct. 2412 (1990). . . .

"We, therefore, must examine both the content of information possessed by the police officer in this case and its degree of reliability in our determination of whether based upon the totality of the circumstances—the whole picture—there existed reasonable suspicion to [continue the detention]. We concern ourselves with both the quantity and quality of the information possessed by the officer." *State v. Slater*, 267 Kan. at 697.

The State asserts that the officers had ample information to support a reasonable suspicion that Anderson was engaged in illegal drug activity; thus they were permitted to extend Anderson's detention beyond the conclusion of the traffic stop to allow time for the drug dog sniff of the truck. We agree. As stated by the Court of Appeals:

"In the instant case, at the conclusion of the traffic stop, the officers had the following information: Anderson, along with documented gang member Cobos, had been at the Amoco station where there was suspected drug activity and there had been numerous arrests of individuals leaving the station; the Amoco station's cashier was a documented Bloods gang member and had been convicted the previous year for possession of drugs; after leaving the Amoco station, Anderson went momentarily to the parking lot of an apartment complex where his truck was immediately surrounded by four Hispanic men . . . ; Anderson was wearing Bloods gang colors and was a documented gang member; Anderson was on parole; [one officer] had observed Anderson speeding and driving left of the center line; during a previous stop, [another officer] had learned that Anderson was carrying $4,000 on his person; and [that officer] previously received information that nar-

cotics detectives were looking into Anderson's activities relating to narcotics trafficking.

"We believe that the combination of the above factors would cause an officer to be reasonably suspicious of drug activity in this case and would warrant further detaining Anderson. Importantly, an officer 'does not have to *know* that the defendant committed a crime. Merely pointing to some facts that would cause a reasonable person to be suspicious is enough to conduct a *Terry* stop.' *State v. Finley*, 17 Kan. App. 2d 246, 251, 838 P.2d 904, rev. denied 251 Kan. 940 (1992). Although the officers had not observed any unlawful conduct [other than the traffic infractions] by Anderson, they were able to point to several facts which would cause a reasonable person to suspect that possible drug activity was taking place. Therefore, the officers were justified in detaining Anderson after the conclusion of the traffic stop." *Anderson*, 34 Kan. App. 2d at 386-87.

### Existence of Probable Cause to Arrest for Drugs

The State also asserts that the officers' reasonable suspicion ripened into probable cause to arrest Anderson after Golston was found to be holding drugs and arrested, the drug dog alerted, and the officers thoroughly searched the truck and found no additional drugs. The State wants us to conclude that additional drugs had to be *somewhere* and that the somewhere was on Anderson's person 30 to 40 feet away from the truck.

We are not willing to do so. Rather, we adopt the Court of Appeals' analysis of this issue. Not only did no probable cause to arrest Anderson for drugs develop when the unproductive search of the truck was completed; the justification for the *Terry* detention ended. In Judge Henry Green's words:

"At this point, the officers' reasonable suspicions that Anderson was involved in drug activity should have lessened. The officers had pursued a method of investigating the suspected drug activity that did not produce anything which would point to Anderson. The search of the truck did not produce any incriminating evidence. Although officers had discovered drugs and money on Golston, they found no incriminating evidence which would indicate that Anderson could be linked to these items. . . . When the officers failed to discover drugs in the truck, the officers had no reasonable basis for continuing their detention of Anderson, and they should have released him. The continued detention of Anderson after the officers failed to discover drugs in the truck became unreasonable. It is apparent that the officers' continued detention of Anderson was based on a hunch. . . . [R]easonable suspicion cannot rest upon the hunch of an experienced officer, even if that hunch turns out to be right. See *United States v. So-*

*kolow*, 490 U.S. at 7. As a result, we determine that at that point the officers' continued detention of Anderson became an unlawful detention.

. . . .

"[The officers' reasonable] suspicion never ripened into probable cause giving officers the authority to arrest Anderson.

. . . .

"The State argues that the following circumstances had the effect of ripening the officers' level of suspicion to probable cause to believe that Anderson was involved in drug activity: the drugs and $1,300 discovered on Golston, the drug dog's alert on the truck, Anderson's attempt to abscond from the scene, and Anderson's attempt to throw out the baggies of drugs. The State maintains that at a minimum, there was probable cause to believe that Anderson was aiding and abetting Golston.

"We do not endorse the State's attempt to bootstrap Anderson's flight from the officers and his action of discarding the drugs into the factors giving the officers probable cause to believe that Anderson was involved in drug activity. As noted in 2 LaFave, Search and Seizure § 3.2(d) (4th ed. 2005), when a warrantless arrest is made, 'the information to be considered is the "totality of facts" available to the officer *at the time of the arrest or search*.' (Emphasis added.) Here, Anderson did not flee the scene and discard the drugs until after the officers had attempted to arrest him. Therefore, these factors are not relevant in determining whether the officers had probable cause to arrest Anderson.

"[T]he remaining factors that the State argues had the effect of ripening the officers' suspicions to the level of probable cause are: (1) the drugs and $1,300 that were found on Golston; and (2) the drug dog's alert on the truck. . . . [W]hen the search of Anderson's truck did not produce anything, this should have dispelled the officers' suspicions pertaining to the drug dog's alert on the truck. Moreover, if the officers possessed reasonable suspicion of Anderson being involved in drug activity, this suspicion should have been lessened after the search of Anderson's truck produced nothing. It is also important to note that officers did not discover anything during the pat-down search of Anderson. It is inconceivable to determine that after the search of Anderson's truck produced no drug evidence, the officers' reasonable suspicion increased to the level of probable cause.

"Furthermore, the fact that Golston had drugs and money on his person does not show that Anderson was guilty of drug activity. Noting that the search or seizure of a person must be supported by probable cause particularized to that person and cannot be avoided by simply pointing out that there is probable cause to search or seize another person, the United States Supreme Court in *Ybarra v. Illinois*, 444 U.S. 85, 91, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979), stated:

> '[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. *Sibron v. New York*, 392 U.S. 40, 62-63, 20 L. Ed. 2d 917, 88

S. Ct. 1889 (1968). Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the 'legitimate expectations of privacy' of persons, not places. [Citations omitted.]'

Here, there was no incriminating evidence discovered during the detention that would indicate that Anderson had drugs on his person or which would link the evidence found on Golston to Anderson.

"The United States Supreme Court's decision in *United States v. Di Re,* 332 U.S. 581, 92 L. Ed. 2d 210, 68 S. Ct. 222 (1948), provides further support for the conclusion that the drugs and money found on Golston, a passenger in Anderson's truck, did not give the officers probable cause to arrest Anderson. In that case, an informant told an investigator with the Office of Price Administration that he was going to buy counterfeit gasoline ration coupons from one Buttita at a designated place. The investigator and a detective followed Buttitta's car to the designated place. The officers found the informant in the backseat holding the counterfeit ration coupons. The informant told the officers that he had bought the coupons from the driver, Buttitta. Di Re was a passenger in the car. The officer arrested all three occupants of the car. At the police station, when Di Re was asked to empty the contents of his pockets and later when he was searched, it was discovered that he had possession of counterfeit ration coupons.

"The *Di Re* Court's opinion turned on whether there was probable cause to arrest Di Re. The Government attempted to defend Di Re's arrest on the theory that there was probable cause to believe he was guilty of conspiracy. Nevertheless, the Court found that the facts of the case did not warrant an inference of participation in conspiracy. The Court noted that there was no evidence establishing that Di Re was in the car when the informant obtained the coupons from Buttitta or that Di Re overheard or participated in any conversation on the matter. The Court further noted that the meeting occurred in a public street in a large city in broad daylight in plain sight of bypassers and that it did not necessarily involve a visibly criminal act. Moreover, the Court stated that 'whatever suspicion might result from Di Re's mere presence seems diminished, if not destroyed, when Reed, present as the informer, pointed out Buttitta, and Buttitta only, as a guilty party.' 332 U.S. at 594.

"Like the facts of *Di Re,* here there was a singling out or incrimination of the other occupant of the car, Golston, to the exclusion of Anderson. At the time of Anderson's arrest, the officers had no information that would implicate or point to Anderson. Moreover, after the search of the car revealed no incriminating evidence, the officers had nothing to link Anderson to the drugs that were found on Golston, that is, to show that Anderson and Golston were involved in a common

enterprise of drug activity. Therefore, the officers lacked probable cause to arrest Anderson." *Anderson,* 34 Kan. App. 2d at 388-92.

The State's only support for a contrary conclusion is *United States v. Anchondo,* 156 F.3d 1043, 1045 (10th Cir. 1998). In *Anchondo,* a drug-sniffing dog twice alerted on defendant's vehicle, which was stopped at a highway checkpoint; no drugs were found. Officers then performed a pat-down of defendant, who had been detained in a trailer, and the pat-down yielded a package of cocaine strapped to the defendant's stomach. Four such packages ultimately were recovered from the defendant.

The *Anchondo* panel held that the warrantless search of the defendant after the dog alerted on the car but no drugs were discovered in it was valid as a search incident to arrest, even though the arrest did not occur until after the search of defendant's person revealed drugs. In the panel's view, the dog's alert and the failure to discover drugs in the vehicle created probable cause to believe that drugs were on the defendant's person. 156 F.3d at 1045.

This court has cited *Anchondo* for unrelated propositions concerning searches incident to arrest. See *State v. Conn,* 278 Kan. 387, 393, 99 P.3d 1108 (2004) (quoting *Anchondo,* 156 F.3d at 1043, and *Rawlings v. Kentucky,* 448 U.S. 98, 111, 65 L. Ed. 2d 633, 100 S. Ct. 2556 [1980]). One Kansas Court of Appeals case and a handful of published and unpublished United States District of Kansas Court opinions also have cited *Anchondo,* but not in regard to the proposition at issue here. See *State v. Brown,* No. 90,139, unpublished opinion filed June 10, 2005); *Agustonelli v. Springer,* 2004 WL 825300, at *3 (D. Kan. April 14, 2004); *Lewis v. Fairbanks,* 2001 WL 789251, at *4 (D. Kan. June 15, 2001); *United States v. Valenzuela Ruiz,* 2000 WL 33417503, at *3 (D. Kan. August 8, 2000); *United States v. Prieto-Zubia,* 103 F. Supp.2d 1292, 1295 (D. Kan. 2000); *United States v. Lee,* 2000 WL 968783, at *3 (D. Kan. June 13, 2000); *United States v. Charles,* 2000 WL 575043, at *4 (D. Kan. May 1, 2000); *United States v. Hernandez,* 1999 WL 318090, at *14 (D. Kan. February 23, 1999).

Although this court has held that a drug dog's alert is sufficient to constitute probable cause to search a vehicle, see *State v. Barker,*

252 Kan. 949, 959-60, 850 P.2d 885 (1993), we do not agree with the *Anchondo* panel's decision that such an alert followed by an unsuccessful search of the vehicle gives law enforcement license to search or arrest the vehicle's driver. Only one other court appears to have endorsed *Anchondo*'s approach. See *State v. Voichahoske*, 271 Neb. 64, 81, 709 N.W.2d 659 (2006) (arrest and strip search of vehicle passenger permitted when dog alerted while passenger inside and passenger appeared to be under influence of drugs). Cases from other jurisdictions are aligned with our *Barker* decision and do not go so far as *Anchondo, i.e.,* a drug dog's alert can provide probable cause to search a vehicle but not to arrest its driver. See *State v. Perry*, 2005 WL 3031741, at *3 (Ohio App. November 14, 2005) (once second drug dog alerted to defendant's vehicle, trooper had probable cause to conduct warrantless search of vehicle); *State v. Simms*, 2005 WL 3210724, at *4 (N.J. Super. December 1, 2005) (probable cause to search vehicle for drugs did not exist until drug dog reacted positively outside it). One state has specifically rejected *Anchondo*'s holding. See *State v. Gibson*, 141 Idaho 277, 286, 108 P.3d 424 (2005) ("To the extent [*Anchondo*] endorses a rule in which a dog's alert on a car, and the subsequent failure of a search of that car to disclose drugs, establishes probable cause to arrest an occupant, we disagree that a similar rule should govern the use of drug detection dogs during routine traffic stops in Idaho."). And several of our sister jurisdictions have declined to adopt a similar holding when presented with similar facts. See *State v. Wallace*, 372 Md. 137, 155-157, 812 A.2d 291 (2002) (drug dog alerted twice on car containing defendant, others; defendant removed from car; defendant searched; cocaine found; arrest followed; court holds dog's general alert on car did not give officers probable cause to search passengers); *State v. Kelly*, 2001 WL 1561543, at *3-4 (Ohio App. December 1, 2001) (ruling canine alert to presence of drugs in car gave police probable cause to search interior of car, but not occupants; general canine alert not specific to defendant); *People v. Fondia*, 317 Ill. App. 3d 966, 969, 740 N.E.2d 839 (2000) (drug dog alerted on car containing defendants; officer removed defendant from car, searched him, found drug paraphernalia; arrested him; canine alert on car's exterior does

not, without more, provide probable cause to search persons of car's occupants).

While we are aware that Tenth Circuit precedent may be persuasive, this court is not bound to follow it. See, *e.g.*, *Wilkins v. Tourtellott*, 42 Kan. 176, 197, 22 Pac. 11 (1889). In this instance, we conclude that adherence to *Anchondo* would be unwise, particularly on the facts of this case. The behavior of the officers who arrested Anderson demonstrated that they knew they lacked probable cause to arrest him without a warrant when their search of the truck came up empty. They did not attempt to arrest him until their efforts to contact the Department of Corrections resulted in Sackhoff's oral arrest and detain order. The sequence of their efforts speaks volumes. There was no probable cause to arrest Anderson for drugs; if his arrest was lawful, it had to be because of his conditional release status and Sackhoff's order. We therefore move to discussion of that aspect of this case.

### Probable Cause to Believe Anderson Was a Conditional Release Violator

On its petition for review, the State appears to have abandoned its earlier argument that Anderson's arrest was justified by probable cause to believe that he was a conditional release violator. We nevertheless address it briefly because it appears to have been somewhat influential in the district judge's decision.

Probable cause to believe a person is a conditional release violator does not permit the person's warrantless arrest. K.S.A. 2005 Supp. 22-2401 states:

"A law enforcement officer may arrest a person under any of the following circumstances:

(a) The officer has a warrant commanding that the person be arrested.

(b) The officer has probable cause to believe that a warrant for the person's arrest has been issued in this state or in another jurisdiction for a felony committed therein.

(c) The officer has probable cause to believe that the person is committing or has committed:

(1) A felony; or

(2) a misdemeanor, and the law enforcement officer has probable cause to believe that:

(A) The person will not be apprehended or evidence of the crime will be irretrievably lost unless the person is immediately arrested;

(B) the person may cause injury to self or others or damage to property unless immediately arrested; or

(C) the person has intentionally inflicted bodily harm to another person.

(d) Any crime, except a traffic infraction or a cigarette or tobacco infraction, has been or is being committed by the person in the officer's view."

A violation of conditional release is not a crime of any type under the Kansas Criminal Code. See K.S.A. 21-3101 *et seq.*; *State v. Sullivan*, 17 Kan. App. 2d 771, 773, 844 P.2d 741 (1993). Even if the officers who arrested Anderson had probable cause to believe he was a conditional release violator, that alone could not justify his warrantless arrest.

### *Sufficiency of Oral Arrest and Detain Order*

Our resolution of the issues above leaves only Sackhoff's oral arrest and detain order as possible authority for Anderson's arrest.

K.S.A. 2005 Supp. 75-5217(a) sets out several methods for arresting an individual in violation of conditional release. The Secretary of Corrections may issue a warrant for the individual's arrest or may personally serve the individual with a notice to appear and answer the charged violation. In the alternative, a parole officer may arrest the individual without a warrant or a parole officer may deputize another officer to arrest the individual by

"giving such officer a written arrest and detain order setting forth that the released inmate, in the judgment of the parole officer, has violated the conditions of the inmate's release. The written arrest and detain order delivered with the released inmate by the arresting officer to the official in charge of the institution or place to which the released inmate is brought for detention shall be sufficient warrant for detaining the inmate." K.S.A. 2005 Supp. 75-5217(a).

Anderson argues that the plain and unambiguous language of this statute required that an arrest and detain order be (1) in writing and (2) in the physical possession of the arresting officer before he could be placed in custody. The State argues the statute does not require the police to actually possess a written arrest and detain order at the time of arrest, only that a written order be issued and delivered to the jail where the defendant is taken.

The State focuses on the statute's "giving" requirement, suggesting such "giving" can be constructive. It supports its argument by citing the dictionary definition of "give," including "to make a present of, . . . to grant or bestow by formal action; . . . to put into the possession of another, . . . or to commit to another as a trust or responsibility." Webster's New Collegiate Dictionary 486 (1976). As the Court of Appeals noted, this definition hurts the State's argument more than it helps it, as it references putting the thing given "into possession" of a recipient. See *Anderson,* 34 Kan. App. 2d at 394. In other words, "giving" an arrest and detain order to an officer would entail putting the order into the officer's possession.

In addition, the statute's inclusion of the word "written" is clear and significant. Sackhoff was authorized to deputize a law enforcement officer to arrest Anderson by "giving such officer a *written* arrest and detain order setting forth that the released inmate, in the judgment of the parole officer, has violated the conditions of the inmate's release." K.S.A. 2005 Supp. 75-5217(a). Sackhoff's oral authorization during a telephone call did not meet the requirement of a written order put into the possession of the officers. His promise to execute a written order and leave it to be picked up at his home later also did not cure this defect.

Although we need look no further than this to resolve this case, we note that our insistence that the order be in writing is consistent with the legislative history.

K.S.A. 75-5217 was enacted in 1973 as part of a new penal code, and its language was nearly identical to that of then-existing statutes in at least four other states. See Idaho Code § 20-227(1) (1947); Ky. Rev. Stat. § 439.430(1) (1956); Miss. Code Ann. §§ 47-7-27, 47-7-37 (1944); Mo. Rev. State. § 217.541 (1987), § 217.720 (1982), § 559.036 (1977). The legislature did not adopt language—and has not since amended the statute—to echo provisions in other jurisdictions allowing oral arrest and detain orders. See Mont. Code Ann. §§ 46-23-1012, 46-23-1023 (1955) (once similar to Kansas language; § 46-23-1012 amended in 1999 to state that any probation officer "may orally deputize any other officer with power of arrest to do so by giving the officer oral authorization and within

12 hours delivering to the detention center a written statement"); Fla. Stat. § 948.06 (1941) (amended in 1989 to remove provision allowing probation officer to "request" law enforcement officer make arrest without warrant). Rather, our statute continues to explicitly require "written" authorization. The legislature is presumed to know the law. See *In re J.M.*, 273 Kan. 550, 44 P.3d 429 (2002). Had it intended to allow oral authorization to support arrest of a conditional release violator, it would have said so.

The district judge's factual finding that there was no written arrest and detain order at the time the officers first attempted to arrest Anderson is supported by substantial competent evidence. His legal conclusion that Sackhoff's later oral authorization was a sufficient substitute was error. The drug evidence seized as a result of the attempted unlawful arrest must be suppressed. See *Wong Sun v. United States*, 371 U.S. 471, 484, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *State v. Canaan*, 265 Kan. 835, Syl. ¶ 3, 964 P.2d 681 (1998).

We do not reach Anderson's further substantive or procedural arguments, including that the written order had to remain in the physical possession of the arresting officer at the time of arrest or that he never violated the conditions of his release, because it is unnecessary to do so. We also do not reach the State's arguments about practical complications; those arguments should be addressed to the legislature. Finally, we do not reach the State's argument that Anderson's flight, in and of itself, justified his arrest. This theory was not pursued before the Court of Appeals.

The Court of Appeals is affirmed, and the district court is reversed. The case is remanded to the district court for further proceedings consistent with this opinion.