NOT DESIGNATED FOR PUBLICATION

No. 119,636

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SHERMAN COLEMAN JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; RICHARD D. ANDERSON, judge. Opinion filed November 15, 2019. Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., STANDRIDGE and WARNER, JJ.

PER CURIAM:  Sherman Coleman Jr. appeals his convictions of one count of possession of methamphetamine and one count of felony interference with law enforcement. Coleman claims the district court erred in denying his motion to suppress based on his allegation that law enforcement officers used racial or other biased-based policing to justify the initial stop and detention. He also claims the district court erred by finding him guilty of felony interference with law enforcement instead of misdemeanor interference with law enforcement. For the reasons we explain below, we reject Coleman's claims and affirm the district court's judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

On May 9, 2017, at about 5 p.m., Topeka Police Department (TPD) Officers Luke Jones, James Schneider, and Justin Long were patrolling central Topeka on their bicycles. The officers were in the 500 block of Topeka Boulevard when they saw two black men walking away from them down the middle of an alley across the street about 50 feet away. Long later testified that he decided to stop the men and talk to them because they were violating Standard Traffic Ordinance for Kansas Cities, Art. 11 § 68(c), adopted by the City of Topeka, which provides that a pedestrian walking along a two-way roadway that has neither a sidewalk nor a shoulder shall walk only on the left side of the roadway.

The officers rode their bicycles through heavy traffic to cross Topeka Boulevard and stop the two men. By the time they made it across the street, the men had walked into an adjacent parking lot. Long asked both men if they had identification. One of the men asked Long if they had done something wrong, and he explained the traffic ordinance violation. One of the men produced an identification card and, after officers determined that he had no active warrants, they told him he was free to leave.

The other man, later identified as Coleman, told Schneider that he had no identification. At first, Coleman gave his name as "Kevin Jones" and also provided a birthdate and social security number. Schneider later testified that he believed the man might be Sherman Coleman Jr., "who had a warrant out for his arrest through the county." Schneider had seen pictures of Coleman a few months earlier when police had been trying to locate him as part of another case. Schneider told the man that he "kind of look[ed] like Sherman [Coleman]" and he believed there was a warrant for his arrest. Schneider retrieved a picture of Coleman from his cell phone, which he showed to Long and Jones to illustrate the similarity to the individual claiming his name was "Kevin Jones." Schneider asked dispatch for warrant information on Sherman Coleman Jr.

Officer Jones patted down Coleman and found a plastic bag in his pants pocket that contained 0.02 grams of methamphetamine. After Jones discovered the methamphetamine, Schneider told Coleman "so any time from here on out that you lie, that's felony obstruction not just misdemeanor obstruction." Despite the warning, Coleman continued to say his name was "Kevin Jones." About a minute later, dispatch informed Schneider that Coleman's birthdate was exactly 10 years after the birthdate "Kevin Jones" had given and that Coleman's social security number was only one digit different from the social security number "Kevin Jones" had given. Coleman then asked what he had a warrant for, and Schneider stated that the warrant was "through community corrections" and he would tell him more specifics if Coleman would admit his true identity. At that point, Coleman admitted his identity and the officers arrested him.

On May 12, 2017, the State charged Coleman with one count of possession of methamphetamine and one count of felony interference with law enforcement. Coleman later moved to suppress the evidence, arguing that the officers unreasonably used his race when deciding whether to begin the encounter with him. The district court held an evidentiary hearing beginning on December 21, 2017. Jones' and Schneider's testimony tracked the facts set forth above. Jones testified that although he made stops related to the ordinance for which he stopped Coleman several times a week, he only issued citations in about 25 percent of those stops. When asked whether Coleman's race was "part of any of the discussions [he] had with the other officers" or whether it "factor[ed] into this stop in any way," Jones responded, "No." When asked whether race was "a consideration that you use when deciding whether to make a stop or enforce a particular ordinance," Jones responded, "No." The district court admitted into evidence State's Exhibit 4, the footage from the body camera Jones was wearing during the stop.

On cross-examination, Jones acknowledged that he had not followed TPD policy on collection of evidence during the encounter. TPD policy required him to place the seized drugs in an evidence envelope, fill out the front of that envelope, and seal and

3

mark the envelope at the scene, but Jones instead put the plastic baggie of methamphetamine into a black latex glove and put it in his "bike bag." Although Jones maintained that he turned the drugs in to the evidence locker before the end of his shift the day of Coleman's arrest, he acknowledged that a report he later prepared showed that the property was not received into evidence until May 11, 2017.

Like Jones, Schneider testified that the decision to stop Coleman had nothing to do with his race; they stopped him only because he was violating a city ordinance. Although Schneider had stopped individuals for violating that particular ordinance several times, he had only issued a citation for the violation "[m]aybe once." The district court admitted into evidence State's Exhibit 6, the footage from Schneider's body camera. The State also called a forensic scientist from the Kansas Bureau of Investigation who testified that the powder recovered from Coleman's pocket was 0.02 grams of methamphetamine.

The second day of the suppression hearing occurred on January 3, 2018. Coleman called Jaimie Dennis, the custodian of records for TPD, and admitted several exhibits into evidence corroborating Jones' admission on cross-examination that he did not follow TPD policy and procedure on collecting and submitting evidence seized in the encounter. Coleman also called Long, who testified about his recollection of the encounter with Coleman. Long's memories generally aligned with Jones' and Schneider's testimony. And like Jones and Schneider, Long testified that race was not a factor in his decision to make the stop. Long testified that his body camera did not record his interaction with Coleman in violation of TPD policy. Long also testified that he had not submitted a report about encountering Coleman because he believed that the other officers' reports were sufficient. Coleman did not testify at the hearing and, after Long's testimony, the defense rested.

The district court requested additional briefing from the parties. At a hearing on March 21, 2018, the district court heard arguments from the parties. Defense counsel conceded that Schneider's body camera footage showed two men walking down the

4

middle of the alley—an infraction of standard traffic ordinance 68(c). After hearing arguments from counsel, the district court ruled from the bench:

"The Court does not find that race was unreasonably used in regard to initiation of the stop. It is clear that there was an ordinance violation. And it is clear that the officers pursued the defendant by crossing traffic and initiated the interaction with the very brief description of the question—with the question, is there really—is there any reason you're walking in the middle of the alley. The court does credit the testimony of the Officers Jones, Schnieder [*sic*] and Long indicating that their purpose was to enforce an ordinance. That race did not come into play when initiating the pursuit or the stop. And that race was not a factor involved in the investigation or any part of the encounter. With those findings made, the Court finds that race was not unreasonably used as a factor in the initiation or enforcement of this ordinance. The Motion to Suppress will be denied."

By agreement of the parties, the case was submitted to the district court for bench trial based on the evidence admitted at the suppression hearing. Coleman contended that at most, he was guilty of misdemeanor interference with law enforcement rather than felony interference because when he gave the false name, the officers were investigating the violation of a city ordinance. The State disagreed, arguing that the officers were investigating Coleman's felony warrant when he gave them a false name. The district court rejected Coleman's argument, convicting him of both counts as charged.

On April 27, 2018, the district court sentenced Coleman to 17 months' imprisonment but granted probation for 18 months. Coleman timely appealed.

MOTION TO SUPPRESS

Coleman first claims the district court erred in denying his motion to suppress the evidence. More specifically, he claims that the officers violated K.S.A. 2018 Supp. 22-4609, which prohibits racial or other biased-based policing. He also argues that the district court did not follow the proper test to determine whether there was biased-based

5

policing established in *State v. Gray*, 306 Kan. 1287, 403 P.3d 1220 (2017). Conversely, the State argues that the district court's denial of Coleman's motion to suppress was supported by substantial competent evidence.

The standard of review for a district court's decision on a motion to suppress has two components. The appellate court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. But the ultimate legal conclusion is reviewed using a de novo standard. In reviewing the factual findings, the appellate court does not reweigh the evidence or assess the credibility of witnesses. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

K.S.A. 2018 Supp. 22-4609 prohibits racial or other biased-based policing to justify a traffic stop, investigatory detention, search, or arrest. The statute provides:

> "It is unlawful to use racial or other biased-based policing in:
>      (a) Determining the existence of probable cause to take into custody or to arrest an individual;
>      (b) constituting a reasonable and articulable suspicion that an offense has been or is being committed so as to justify the detention of an individual or the investigatory stop of a vehicle; or
>      (c) determining the existence of probable cause to conduct a search of an individual or a conveyance."

K.S.A. 2018 Supp. 22-4606(d) defines "[r]acial or other biased-based policing" as

> "the unreasonable use of race, ethnicity, national origin, gender or religion by a law enforcement officer in deciding to initiate an enforcement action. It is not racial or other biased-based policing when race, ethnicity, national origin, gender or religion is used in combination with other identifying factors as part of a specific individual description to initiate an enforcement action."

6

Coleman argues that the officers violated K.S.A. 2018 Supp. 22-4609(b) by using racial or other biased-based policing to justify his initial stop and detention. As a result, he asserts that all evidence derived from the stop and detention must be suppressed. In *Gray*, our Supreme Court held that K.S.A. 22-3216(1) "provides a suppression remedy for a violation of" K.S.A. 2018 Supp. 22-4609 even if there is no claim that the defendant's constitutional rights have been violated. 306 Kan. 1287, Syl. ¶ 1.

Before addressing the evidence at the suppression hearing, we must first resolve Coleman's argument that the district court did not apply the correct test to decide whether the officers engaged in biased-based policing. "Only if the judge applied the correct legal test would we turn to the factual issues and determine if substantial competent evidence supported the judge's findings and if the judge reached the correct legal conclusion." *Gray*, 306 Kan. at 1294. The Kansas Supreme Court has identified the test a district court should use when considering a motion to suppress based on an alleged violation of Kansas biased-based policing statutes: "The district judge must examine more than the ultimate justification of a traffic stop and must consider whether an officer 'unreasonably use[d]' race or another characteristic listed in K.S.A. 2014 Supp. 22-4606(d) in deciding to initiate the enforcement action of a traffic stop." 306 Kan. at 1298.

Here, the district court explicitly identified *Gray* as the controlling law governing Coleman's motion to suppress. In denying the motion, the district court found "that race was not unreasonably used as a factor in the initiation or enforcement of this ordinance [for which Coleman was stopped]." There is no indication that the district court used the wrong test when considering whether the officers violated K.S.A. 2018 Supp. 22-4609, and Coleman's argument to the contrary fails.

Turning to the merits of the motion to suppress, Coleman at first bore the burden to assert facts showing that (1) he "is a member of a class listed in K.S.A. [2018] Supp. 22-4606(d) and (2) the reasons for arguing that race (or another listed characteristic) was

unreasonably used in the decisionmaking process for initiating the stop." *Gray*, 306 Kan. at 1301-02. The district court found that Coleman met that burden, and the State has not filed a cross-appeal on that point, so this court need not reexamine this step of the process. See *State v. Rosa*, 304 Kan. 429, 437-38, 371 P.3d 915 (2016) ("[T]o obtain appellate review of adverse findings, appellee must file notice of cross-appeal.").

"[O]nce a defendant has filed a motion to suppress stating the basis for the claim that a search and seizure were unlawful, the State has the burden of proving that the search and seizure were lawful." *Gray*, 306 Kan. 1287, Syl. ¶ 4. Coleman argues that the district court erred in finding that the State met that burden. He points out that the officers had the discretion to choose whether to enforce the ordinance. Schneider testified that he had only issued a citation for violating that particular ordinance "[m]aybe once" and Jones testified that he did not issue citations for violating this particular ordinance "very often." Coleman argues that given all of these circumstances, "there must be some reason given for why the officer[s] chose to make the stop of the two black men."

Coleman also emphasizes the officers' admission that they violated TPD policies during the arrest. Jones testified that he did not comply with TPD policy on the seizure of property and evidence. He did not properly package the drugs at the scene after seizing them nor did he take a picture of the drugs in their original packaging using a photo scale and a camera. Long testified that he did not file a written report of his interaction with Coleman despite TPD policy requiring officers to "submit reports to document incidents, investigations, and officer actions." Long also testified that his body camera did not record his interaction with Coleman in violation of TPD policy, although Coleman agrees that footage from Jones' and Schneider's body cameras were admitted into evidence.

Coleman asserts that the officers' "multiple violations of department policy" casts doubt on "their adherence to the law proscribing biased-based policing." The State asserts that none of the alleged violations of TPD policy reveal a tendency toward illegal biased-

8

based policing. The State also argues that Coleman essentially is asking this court to reweigh the evidence and second-guess the district court's decision to find credible the officers' testimony that race played no factor in their decision to initiate the stop.

The officers stopped Coleman and his companion because they violated Topeka standard traffic ordinance 68(c). "A traffic violation provides an objectively valid reason to effectuate a traffic stop, even if the stop is pretextual." *State v. Anderson*, 281 Kan. 896, 901, 136 P.3d 406 (2006); see *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996). But if the evidence shows that an officer's pretextual stop is motivated by racial or other biased-based policing, then such conduct runs afoul of K.S.A. 2018 Supp. 22-4609. See *Whren*, 517 U.S. at 813 ("We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race."). Because it is undisputed that Coleman was violating an ordinance when the officers decided to stop him, the district court's duty was to determine whether the officers unreasonably used race as a factor in initiating the stop. *Gray*, 306 Kan. at 1302. As the Kansas Supreme Court acknowledged in *Gray*:

> "This means that ultimately, at least in many cases, the determination of whether an officer unreasonably used race will largely depend on credibility—a weighing-of-the-evidence process that is already quite familiar to district judges. As with any credibility assessment, a district judge must weigh surrounding facts and circumstances along with a witness' statements. . . . [T]he district court must consider whether race, national origin, ethnicity, gender, or religion was unreasonably used in deciding to *initiate* the enforcement action. This means that a judge will consider any reasons proffered by the State as to why a particular [ordinance] was enforced and determine whether those reasons credibly, fairly, and uniformly would result in decisions to initiate traffic stops regardless of a[n individual's] race, ethnicity, national origin, gender, or religion." 306 Kan. at 1302-03.

9

Here, all three officers testified that race did not come into play in initiating the stop. The district court explicitly found the officers' testimony credible. A district court is uniquely situated to evaluate the credibility and demeanor of witnesses testifying about their motivations to determine whether they were improperly based on race. Not only did the district court observe the officers' demeanor as they testified at the hearing, but the court was able to watch the videos of the encounter on the body camera footage admitted into evidence. The district court certainly did not have to believe the officers' testimony that race was not a factor in deciding to stop Coleman if other facts caused the court to question whether the officers' motivations were improperly based on race.

Both Jones and Schneider testified that they usually do not issue a citation when they stop a pedestrian for violating standard traffic ordinance 68(c). But the fact that the officers arbitrarily enforced the traffic ordinance does not make the stop unlawful under K.S.A. 2018 Supp. 22-4609 without some showing that the arbitrary enforcement was motivated by racial or other biased-based policing. See, e.g., *Whren*, 517 U.S. at 813 (when officer can articulate facts demonstrating that the officer suspected the accused has committed a crime, a seizure is valid even though pretextual); *State v. Greever*, 286 Kan. 124, 140, 183 P.3d 788 (2008). Likewise, just because the officers did not follow TPD procedure on collecting and submitting evidence, it does not follow that the stop and detention were motivated by racial or other biased-based policing.

The fact that Long's body camera did not record his interaction with Coleman and the fact that Long did not submit a written report about the encounter might have caused the district court to question the credibility of his testimony. But Jones and Schneider did submit written reports, and their body camera footage was admitted into evidence at the suppression hearing. So the district court could watch the officers' actions and hear their conversations with each other and with Coleman as the encounter actually happened on the street. There is nothing materially inconsistent with the officers' testimony about their encounter with Coleman and the body camera footage admitted into evidence.

10

To sum up, all three officers testified that race was not used as a factor in initiating the traffic stop and the district court explicitly found the officers' testimony credible. The officers' testimony was corroborated by the body camera footage admitted into evidence, and there was no other evidence at the hearing reasonably showing that the officers' motivations were improperly based on race. In reviewing the district court's factual findings, the appellate court does not reweigh the evidence or assess the credibility of witnesses. *Hanke*, 307 Kan. at 827. Given the district court's credibility determination of the officers' testimony, which this court will not second-guess, together with the other evidence submitted at the suppression hearing, we find there was substantial competent evidence to support the district court's legal conclusion that the officers did not unreasonably use race in deciding to stop Coleman to enforce the ordinance he was violating. Thus, we find the district court did not err in denying Coleman's motion to suppress the evidence based on an alleged violation of K.S.A. 2018 Supp. 22-4609.

### FELONY INTERFERENCE WITH LAW ENFORCEMENT

Next, Coleman claims there was insufficient evidence to support his conviction of felony interference with law enforcement because the officers were not investigating a felony offense when he gave false identifying information. The State argues the opposite.

"When challenged, an appellate court reviews the evidence's sufficiency by '"looking at all the evidence in a light most favorable to the prosecution and determining whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt."' 'In doing so, the appellate court generally will "not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations."' [Citations omitted.]" *State v. Parker*, 309 Kan. 1, 14, 430 P.3d 975 (2018).

The district court found Coleman guilty of interference with law enforcement under K.S.A. 2018 Supp. 21-5904(a)(1)(C), which defines interference with law enforcement as falsely reporting to a law enforcement officer "any information, knowing

11

that such information is false and intending to influence, impede or obstruct such officer's . . . duty." The evidence was undisputed that after the stop, Coleman gave Schneider a false name, birthdate, and social security number. Coleman does not dispute that this action impeded or obstructed Schneider's official duty, but he disputes the classification of the crime as a felony instead of as a misdemeanor.

Under K.S.A. 2018 Supp. 21-5904(b)(2)(B), this type of interference with law enforcement is a "severity level 9, nonperson felony in the case of a felony," and otherwise is a class A nonperson misdemeanor. In other words, whether interference with law enforcement is a felony or misdemeanor depends on whether the officer is seeking to carry out an official duty related to a felony or a misdemeanor when the interference takes place. See *State v. Hudson*, 261 Kan. 535, 538-39, 931 P.2d 679 (1997); *State v. Lundquist*, 30 Kan. App. 2d 1148, 1154, 55 P.3d 928 (2002). This case provides a good example of why this test is not always easy to apply.

Coleman argues that when he gave the officers false identifying information, the officers were enforcing a traffic infraction. Coleman is correct that the officers initially stopped him for violating the traffic ordinance. But the stop quickly turned into an investigation of whether the suspect had any active arrest warrants. Coleman admits that he continued to assert the false identity even after the officers began investigating the possible arrest warrant. Coleman does not dispute that his actions impeded the investigation of the active warrant, but he argues that the State did not present sufficient evidence to prove that the active warrant was on a felony charge.

Coleman asserts that the warrant on which he was arrested was for domestic battery, which can be either a felony or a misdemeanor, but the record does not support Coleman's assertion. Coleman is correct that at one point Jones testified that he was aware of Coleman because he had been identified on "the hot sheet"—a sheet that lists persons the TPD is trying to locate—"for a domestic battery charge." But Jones did not

12

testify that the warrant they were investigating Coleman for stemmed from that charge. In fact, while the officers were waiting for dispatch to respond, they told Coleman that they were not investigating any prior dispute between him and his girlfriend.

Instead, the evidence shows that the officers were investigating whether Coleman was subject to a felony probation violation warrant. In the body camera footage, when Coleman asked what he had a warrant for, Schneider stated that the warrant was "through community corrections." Schneider's body camera footage also reveals that dispatch informed Schneider that the warrant for Coleman's arrest was for a probation violation. At the evidentiary hearing, the prosecutor described State's Exhibit 7 as a copy of a warrant issued "on October 24, 2016, for a felony case in this division" and which was "returned served on May 9, 2017, when Mr. Coleman was placed under arrest." The district court admitted State's Exhibit 7 into evidence without objection.

State's Exhibit 7 is a warrant issued in case No. 14CR1508 because Coleman was "alleged to have violated the conditions of his probation and release, said probation having been granted to said Defendant from a conviction of the offense[s] of Possession of Narcotics (2-counts), as defined by K.S.A. 21-5706." As the State points out, K.S.A. 2018 Supp. 21-5706(a) criminalizes possession of narcotics, among other things, and the penalty for violating that subsection is a drug severity level 5 felony. See K.S.A. 2018 Supp. 21-5706(c)(1). Consistent with the statutory penalty, an unknown person handwrote "F-Drug-5" across the top of the warrant admitted into evidence as State's Exhibit 7. Thus, the State introduced direct evidence at the hearing that on May 9, 2017, the officers were investigating whether Coleman was subject to a probation violation warrant for felony possession of narcotics.

Finally, as the State argues, Coleman continued to give a false name even after the officers found methamphetamine on his person. At that point, it is clear that the officers were also investigating Coleman for felony drug possession, a charge that was later filed

against him. Schneider can be heard on his body camera footage telling Coleman that if he continued to lie about his identity after the officers discovered the methamphetamine, he would be facing "felony obstruction not just misdemeanor obstruction."

Viewing all the evidence in the light most favorable to the prosecution, a rational fact-finder could have found Coleman guilty beyond a reasonable doubt of obstructing law enforcement in the investigation of a felony probation violation warrant and also a possible felony drug possession charge when he provided false identifying information. Thus, we conclude there was sufficient evidence to support Coleman's conviction of felony interference with law enforcement.

Affirmed.