IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,573

STATE OF KANSAS,
*Appellee*,

v.

LARRY D. HUGGINS III,
*Appellant*.

SYLLABUS BY THE COURT

1.

A jury instruction is legally inappropriate if it adds alternate statutory elements not included in a charging document.

2.

There is no requirement that the State prove all facts alleged in a charging document to support a conviction for the charged crime.

3.

Overreach by a government actor is a necessary predicate to a determination that a statement is not voluntary under the Fifth and Fourteenth Amendments.

4.

There must be a link between government overreach and the resulting statements that a defendant makes to law enforcement to render such statements involuntary under the Fifth and Fourteenth Amendments.

1

5.

An objection made at trial must be sufficiently specific to give the trial court a reasonable understanding of the basis of the objection.

Appeal from Shawnee District Court; CHERYL A. RIOS, judge. Oral argument held May 8, 2024. Opinion filed August 30, 2024. Affirmed in part, vacated in part, and remanded with directions.

*James M. Latta*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Jodi Litfin*, deputy district attorney, argued the cause, and *Kris W. Kobach* attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Larry D. Huggins III appeals from his convictions of felony murder, attempted aggravated robbery, aggravated burglary, and conspiracy to commit aggravated robbery. Finding no errors in his trial, we affirm the convictions, but we vacate the imposition of fees and remand the case for reconsideration of the fees.

FACTUAL AND PROCEDURAL BACKGROUND

A series of unfortunate events beginning on November 11, 2019, resulted in the deaths of two young men the following day. At that time, 15-year-old O.H. lived in a house on Southeast Maryland Avenue in Topeka. O.H. sometimes sold marijuana, and his friend Z.M. occasionally helped him with that enterprise. O.H. generally carried a 9-millimeter semiautomatic gun in a holster on his waist.

Fourteen-year-old J.B. was an acquaintance of O.H. Beginning on November 11, J.B. initiated a series of electronic messages with Larry Huggins, responding to a video J.B. saw posted on Huggins' Facebook account. In the course of these messages, J.B. suggested that O.H. would be a good target for a robbery. These messages initially took place through Facebook, and then the two began texting each other.

J.B. told Huggins that O.H. had firearms, marijuana, and money. J.B. also sent a picture of Z.M. holding a handgun and an assault rifle. The two agreed that J.B. could pretend to buy marijuana and Huggins would then steal any drugs, money, or guns he could find. J.B. would pretend to be a victim as well and later meet up with Huggins to divide up the stolen property. They contemplated committing the robbery that evening, but the plan did not materialize because they could not procure a car.

The two resumed their electronic dialogue the next morning. When J.B. told Huggins to let him know what was going on, Huggins replied: "Let's do that." They continued discussing their strategy for carrying out the robbery. J.B. was to meet Huggins outside when Huggins showed up with a car.

Early that afternoon, Reginald McKinney drove to pick up a longtime friend at the bus station. When McKinney arrived, two other youths were in the car with him: D.P. and Huggins. The friend noticed that Huggins was holding a semiautomatic handgun on his lap. McKinney dropped the friend off, and McKinney, D.P., and Huggins proceeded to pick up J.B. The four then drove to O.H.'s house.

That afternoon, O.H. picked Z.M. up from school, and the two eventually arrived at O.H.'s house, where they played video games in his bedroom. A while later, J.B. showed up and asked for a ride home. O.H. repeatedly told J.B. no. J.B. remained in O.H.'s house, and he told O.H. there were people in the front yard. J.B. said he knew the

people and would go out to talk with them. As he started to leave the house, he was holding O.H.'s handgun, but O.H. told him to give it back before he went outside.

After talking with the people outside, J.B. returned to the house and said they wanted to use a phone. Both O.H. and Z.M. said no, and J.B. went back outside and spoke briefly again with the people gathered there.

Shortly after J.B. came back in the house, the three people came up to the door and knocked. O.H. opened the door slightly, and the people pushed in the door and rushed in the house. At least one of the intruders was holding a firearm.

J.B. and D.P. went into O.H.'s bedroom, where Z.M. was standing. D.P. asked Z.M. where "the big gun" was, and Z.M. told him it was behind the door. As D.P. went to take the gun, Z.M. heard O.H. yelling, "No, please, please." Then O.H., who was in the living room, began to fire shots.

Huggins turned and ran from the house, sustaining a bullet wound to his leg as he ran. McKinney also ran from the house, but he fell down outside the door. As he lay on the porch, he fired up towards O.H., who was shooting down at him. A mortally wounded McKinney made his way across the yard before collapsing on the ground.

When the shooting began, D.P. and J.B. hid in a closet in the bedroom. After the shooting stopped, D.P. ran out of the house, and J.B. walked out behind him, taking one of the guns with him. He walked over to where McKinney was lying in the yard and stayed with him until the police arrived and determined McKinney was deceased.

When the shooting stopped, Z.M. came out of the bedroom. O.H. walked toward him, leaned against a wall, and asked if he was okay. O.H. then slid down to the floor and

did not move again. He died from two gunshot wounds, one to the chest and one to the groin area. Z.M. called the police.

Meanwhile, Huggins sent a text to a woman with whom he was involved, telling her he was "hit." He later asked her to pick him up. She drove him to the home of his stepmother, who gave him some pain medication she had on hand from a recent surgery, and the three then drove to a hospital. Police officers arrived at the hospital, and the woman consented to a search of her car. Police found and confiscated Huggins' cell phone.

When Huggins was released from the hospital that evening in a wheelchair, the police took him into custody. After about a four-hour wait at the police headquarters, they interviewed him. He denied any involvement in the shooting at O.H.'s house, claiming that he had received his bullet wound in a driveby shooting somewhere else in town. The police released him, but they conducted a second interview with him two days later, and he continued to contend he had nothing to do with events leading to McKinney's and O.H.'s deaths.

Police later obtained a search warrant for Huggins' Facebook account, and Facebook supplied information that included messages sent and received on that account. Police also obtained text messages recovered from Huggins' phone.

At trial, Huggins testified on his own behalf. He told the jury much the same sequence of events that other witnesses recounted, but, in his version, by the time the youths picked up J.B. on the day of the shootings, Huggins had decided not to rob O.H. and instead intended to simply buy some marijuana from him.

Huggins dissociated himself from any criminal intent at the time of the shootings. He said he did not tell D.P. or McKinney about the robbery plan he had formulated with J.B. He testified he never went into O.H.'s house because he got shot when he reached the threshold. He did not remember going to the hospital, and he told the jury he made up a story at his interview because an inmate had once told him he should always provide an alibi defense. He denied owning a gun, but he admitted on cross-examination that he tried to sell a gun for $260 on Facebook after the shootings.

The jury found Huggins guilty on all four counts: first-degree felony murder; attempted aggravated robbery; aggravated burglary; and conspiracy to commit aggravated robbery. He was sentenced to a hard 25 life sentence for the murder conviction. He received a consecutive sentence of 32 months for attempted aggravated robbery, another consecutive sentence of 71 months for aggravated burglary, and a concurrent sentence of 32 months for conspiracy to commit aggravated robbery, for a controlling term of a minimum 25 years plus 103 months. He was also ordered to pay $2500 as BIDS attorney fees.

On appeal, Huggins asserts errors in both the conduct of his trial and the imposition of fees.

ANALYSIS

*Section 5: Right to Jury Trial*

The State charged Huggins with attempted aggravated robbery of "O.M.H. . . . and Z.M." The corresponding jury instruction differed because it omitted Z.M. as a victim. On appeal, Huggins argues the instruction's failure to include both victims alleged in the charging document deprived him of his right to jury trial as guaranteed by section 5 of the

Kansas Constitution Bill of Rights. He urges this court to hold that a violation of the jury trial right under section 5 is a structural error and reverse his convictions.

Huggins presents this argument for the first time on appeal. He argues this court may review it because it involves only a question of law arising on admitted facts and is finally determinative of the case; and consideration of the theory is necessary to prevent the denial of a fundamental right.

We decline to utilize either preservation exception, even if they are applicable. Because Huggins presents a novel and consequential issue, argument to and analysis from the district court would have been helpful. See *State v. Gray*, 311 Kan. 164, 170, 459 P.3d 165 (2020) (declining to apply exception because failure to present issue below "deprived the trial judge of the opportunity to address the issue in the context of this case and such an analysis would have benefitted our review"). Like in *Gray*, we decline to review Huggins' unpreserved issue.

*Alleged Instructional Error*

Huggins next argues that regardless of whether the mismatch between the charging document and the attempted aggravated robbery instruction violated section 5 of the Kansas Constitution, the mismatch rendered the jury instructions for all four charges clearly erroneous.

This court reviews alleged instructional errors in multiple steps. It first considers "jurisdiction and whether the issue is preserved." *State v. Martinez*, 317 Kan. 151, 162, 527 P.3d 531 (2023). It then analyzes whether the instruction was "both legally and factually appropriate." 317 Kan. at 162. In the last step, it "review[s] any error for harmlessness, using different standards depending on whether the claim has been

7

preserved. If a defendant failed to object to the instruction at trial, [it] reverse[s] only for clear error." 317 Kan. at 162. In that case, "the defendant has the burden to firmly convince [the court] that the jury would have reached a different verdict if the instructional error had not occurred." 317 Kan. at 162. Because Huggins did not object to the jury instructions below, review is for clear error.

Huggins argues the jury instruction for attempted aggravated robbery was legally erroneous because it did not include Z.M. as a victim. He argues the instructions for felony murder, aggravated burglary, and conspiracy to commit aggravated robbery were legally erroneous because they referred to the erroneous attempted aggravated robbery instruction in describing the elements of aggravated robbery. He argues that "all the instructions are missing, either in the instruction itself or by incorporation, the essential element of Huggins or his friends intending (and agreeing for conspiracy) to rob O.H. *and* Z.M., not just O.H."

A jury instruction that totally "omits an essential element of the crime charged" is legally erroneous. *State v. Jones*, 313 Kan. 917, Syl. ¶ 3, 492 P.3d 433 (2021). We therefore consider whether the jury instruction for attempted aggravated robbery omitted an essential element of that crime.

The elements of aggravated robbery are "knowingly taking property from the person or presence of another by force or by threat of bodily harm to any person . . . [while] armed with a dangerous weapon." K.S.A. 21-5420. The statutory elements of attempt are "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 21-5301(a).

8

The court instructed the jury that the elements of the crime of aggravated robbery are:

"1. The defendant knowingly took property from the person or presence of [O.H.].

"2. The taking was by threat of bodily harm or force.

"3. The defendant was armed with a dangerous weapon or inflicted bodily harm on any person in the course of such conduct."

It instructed the jury that, to find Huggins guilty of attempted aggravated robbery, it had to find:

"1. The defendant performed an overt act toward the commission of aggravated robbery.

"2. The defendant did so with the intent to commit aggravated robbery.

"3. The defendant failed to complete the commission of aggravated robbery."

It is clear the attempted aggravated robbery instruction included every statutory element of the charged crime.

Huggins does not contest that conclusion, but he argues that the jury instruction had to include more than just the statutory elements of the charged crime. He insists that the State expanded the elements of attempted aggravated robbery through its complaint. He asserts that through the charging document, the State made robbing Z.M. and O.H., specifically, part of the "total element" of taking property from the person or presence of another within the crime of aggravated robbery or any crime that relied on aggravated robbery as an underlying felony. He cites *State v. McClelland*, 301 Kan. 815, 828, 347 P.3d 211 (2015), and *State v. Trautloff*, 289 Kan. 793, 802, 217 P.3d 15 (2009), in support.

Neither *McClelland* nor *Trautloff* support Huggins' claim. In these cases, we held jury instructions "were overly broad and erroneous because they added alternate *statutory*

9

elements of a crime that were not included in the complaint or information." (Emphasis added.) *State v. Crosby*, 312 Kan. 630, 640, 479 P.3d 167 (2021). Neither stands for the notion that the State can expand the elements of a crime through factual allegations in a charging document. In fact, in *Crosby*, we held a jury instruction was legally appropriate under similar circumstances to Huggins'. There, the State charged the defendant with attempted aggravated robbery and alleged two distinct and specific overt acts against two distinct victims, while the jury instruction required the jury find only that the defendant commit a single, nonspecified overt act. This court held there was no error because the factual omissions in the jury instructions had not altered the elements of the crime. 312 Kan. at 641.

Because the jury instruction for attempted aggravated robbery included the statutory elements of the charged crime, it was legally appropriate and was not erroneous. This defeats Huggins' claim that any instructions that referred to the attempted aggravated robbery instruction were also erroneous.

*Sufficiency of the Evidence*

Huggins argues the State failed to offer sufficient evidence to support the attempted aggravated robbery, aggravated burglary, and felony murder convictions. He again turns to the charging document, claiming the State had to prove Z.M. was a victim of these crimes because he was alleged to be a victim of attempted aggravated robbery therein. He contends there was no evidence he attempted to rob Z.M.

When a defendant claims there was insufficient evidence to support a conviction, this court considers "whether, viewing the evidence in the light most favorable to the State, a rational fact-finder could have found the defendant guilty beyond a reasonable doubt." *State v. Larsen*, 317 Kan. 552, 560, 533 P.3d 302 (2023). It does not "reweigh

evidence, resolve evidentiary conflicts, or assess witness credibility." *Larsen*, 317 Kan. at 560.

Huggins again cites *Trautloff*, 289 Kan. 793, and *McClelland*, 301 Kan. 815, to support his claim that the State had to prove he attempted to rob Z.M. to support the attempted aggravated robbery, aggravated burglary, and felony murder convictions. Quoting these cases, he claims, the State is "bound by the wording of its charging document." *McClelland*, 301 Kan. at 828.

We effectively rejected the notion that the State must prove all the facts alleged in the charging document when we held the instructions were legally appropriate even though they did not include Z.M. as a victim. The State is indeed required to prove the *statutory elements* charged, regardless of what instructions are offered to the jury. See *State v. Fitzgerald*, 308 Kan. 659, 666, 423 P.3d 497 (2018) (when jury was instructed on different elements than the State charged, court reviewed whether there was sufficient evidence to support elements in charging document). But robbing or attempting to rob Z.M. was not an element of any of the crimes; it was a factual allegation in support of the attempted aggravated robbery charge. See *Crosby*, 312 Kan. at 641 (naming of two victims in charging document was factual assertion, not description of elements).

As we discussed above, the cases to which Huggins cites stand for the notion that the State is bound by the statutory elements included in the complaint or information—not the facts. *Crosby*, 312 Kan. at 641. The State did not need to prove that Huggins intended to rob Z.M. to sufficiently support the convictions. This defeats Huggins' sufficiency claim.

11

*Voluntariness of Huggins' Statements*

After he was released from the hospital and was in a wheelchair because of his bullet wound, Huggins was taken to the downtown Topeka police headquarters. He waited there for around four hours and then, after receiving and orally agreeing to waive his *Miranda* rights, he took part in an interview that lasted a little over half an hour. He denied any participation in or knowledge of the events at O.H.'s house. Two days later, the police conducted a second interview. Huggins' statement remained essentially the same as it was during the first interview.

Huggins later sought to suppress the statements that he made to police during the first interview, arguing that the interview violated his Fifth Amendment privilege against self-incrimination. He argued to the trial court that he was under the influence of various medications that rendered him intoxicated and incapable of making voluntary statements, and he contended that his behavior prior to and during the interview supported that conclusion. Following a *Jackson v. Denno* hearing, the district court found his statements were voluntary and allowed the State to play a recording of the interview to the jury. Huggins did not contest the voluntariness of the second interview.

On appeal, Huggins argues the district court erred in denying his motion to suppress. He repeats his allegation that his participation in the first interview was involuntary because of a diminished mental state resulting from medication, fatigue, and trauma. We disagree and conclude the district court did not err when it concluded Huggins made his statements voluntarily and denied the motion to suppress.

After a trial court decides whether a statement is voluntary under the Fifth and Fourteenth Amendments and a party appeals that decision, this court applies a standard of review that divides the voluntariness determination into questions of fact and questions of

12

law. The trial court's findings of the "crude historical facts"—the events and occurrences surrounding the statement—receives deferential review on appeal, and the question is whether those findings are supported by substantial competent evidence. *State v. G.O.*, 318 Kan. 386, 404-07, 543 P.3d 1096 (2024). This court does not reweigh the evidence, assess witness credibility, or resolve evidentiary conflict, and it disregards any conflicting evidence or other inferences that might be drawn from the evidence. *G.O.*, 318 Kan. at 407. The court examines the totality of the circumstances and assesses de novo the district court's legal conclusion on whether the statement was voluntary. 318 Kan. at 407.

The Fifth Amendment protection against self-incrimination and the Fourteenth Amendment Due Process Clause require that statements made to government officials are given voluntarily. Overreach by police or other state actors—that is, intimidation, coercion, deception, or other misconduct—is a necessary predicate to finding a confession is not voluntary, and there must be a link between the overreach and a defendant's resulting confession to establish the constitutional violation. *G.O.*, 318 Kan. at 404.

In *G.O.*, we referred to examples of techniques that constitute per se coercive conduct, such as extreme psychological pressure or physical harm. *G.O.*, 318 Kan. at 398. But we also recognized that less onerous police conduct may also overcome an individual's ability to decide freely whether to make statements if the individual has particular vulnerabilities, either situational or ongoing. 318 Kan. at 399-400. We set out a lengthy, nonexhaustive list of factors for consideration in this analysis:

> "Potential details of the interrogation that may be relevant include:  the length of the interview; the accused's ability to communicate with the outside world; any delay in arraignment; the length of custody; the general conditions under which the statement took place; any physical or psychological pressure brought to bear on the accused; the officer's fairness in conducting the interview, including any promises of benefit, inducements,

13

threats, methods, or strategies used to coerce or compel a response; whether an officer informed the accused of the right to counsel and right against self-incrimination through the *Miranda* advisory; and whether the officer negated or otherwise failed to honor the accused's Fifth Amendment rights.

"Potential characteristics of the accused that may be relevant when determining whether the officer's conduct resulted in an involuntary waiver of constitutional rights include the accused's age; maturity; intellect; education; fluency in English; physical, mental, and emotional condition; and experience, including experience with law enforcement.

"These—and other factors arising from facts of a case—may be relevant no matter whether the accused is a juvenile or an adult, making separate lists unnecessary. But in cases involving a juvenile, we continue to urge judges to exercise great care in weighing these factors to decide whether the juvenile's inculpatory statement to law enforcement was voluntary." *G.O.*, 318 Kan. at 403.

In this case, the district court made extensive findings relating to Huggins' mental state at the time of the interview. The court found that Huggins was taken to an interview room approximately an hour and 40 minutes after he arrived at the hospital with a gunshot wound. He was "clearly tired" and "slept in a wheelchair for a good number of hours." The court found that when Huggins first arrived, he was clearly agitated. He repeatedly knocked on the door and inquired why he was there, threw water on the table, banged on the table, and appeared to be chewing something. The court noted "it makes sense that he would have been given some pain medication at the hospital" and found Huggins "was under the influence of some medication or something at the beginning of the period of time when he was in the room alone." But the court further found that by the time the interview began, around four hours after Huggins' arrival, the effects of any medication had worn off. By then, Huggins was calm, coherent, and aware of what was going on around him. As the court noted, if the interview had taken place earlier, considerations such as medicinal intoxication and fatigue might have been significant, but

14

the passage of time mitigated those considerations: Huggins was able to take a nap, and he showed no signs of intoxication when the interview began.

The court also compared the second interview, which Huggins did not challenge before trial and does not challenge on appeal, with the first. The district court noted that Huggins' demeanor and statements at the two interviews were essentially the same. The district court concluded these factors showed Huggins' statements were voluntary.

Huggins does not contest the district court's factual findings. He argues only that the court made a legal error in concluding those findings show his statement was voluntary. He asserts that his injury, the medication, fatigue, and a lengthy wait before his interview began all were factors that so diminished his capacity to make voluntary statements that this court must conclude his statements were involuntary.

We disagree with Huggins. While these factors *could* have come into play in terms of law enforcement overreaching, there is no evidence or findings from the district court suggesting that they actually did come into play. The district court found Huggins was calm and coherent and that any effects of medication had worn off by the time the interview began. Under those circumstances, the police did not overreach when they went forward with their brief interview of Huggins. And Huggins makes no allegation that the officers offered threats or promises or attempted to mislead Huggins about the purpose of the interview.

Our conclusion is in accord with that of the district court: Huggins made his statements unaffected by factors that would inhibit his ability to act voluntarily. We conclude the district court did not err when it admitted the recording of Huggins' first interview.

*Admissibility of Facebook Records*

Law enforcement officers served a warrant on Facebook to obtain Huggins' account records, which provided the State with the messages he exchanged with J.B. In two pretrial motions, Huggins sought to suppress admission of those messages, arguing different theories: the warrant was defective because it lacked particularity, and the State had failed to establish a foundation for the records. The district court overruled both pretrial motions. At trial, Huggins again objected to admission of the messages, and again the court overruled him.

Now, on appeal, he argues the district court erred when it admitted the messages because the warrant on which the search of his Facebook account was based lacked particularity and was therefore an unreasonable search under the Fourth Amendment to the United States Constitution. The State contends he failed to preserve the issue for appeal because of the way he asserted his challenge during the trial.

A close examination of how the issue of the constitutionality of the search warrant was presented to the district court supports the State's preservation claim.

On November 21, 2019, the State served on Facebook a warrant to search Huggins' account. Facebook provided extensive records of his posts and messages, a redacted portion of which the State eventually presented to the jury. Of special significance to the prosecution, the records showed communications between Huggins and J.B. before and after the shootings, and these communications suggested the two were planning to steal things from O.H. and Z.M.

On July 13, 2020, Huggins' attorney at the time, Gary Conwell, filed a Motion to Suppress, urging suppression of the fruits of the search because the warrant failed to

describe with particularity the information the State was seeking as it related to the prosecution for the shootings. This is the claim that Huggins seeks to assert on appeal.

On October 27, 2020, the district court conducted an evidentiary hearing on the motion to suppress. At the hearing, Conwell emphasized his allegation that the warrant for Facebook records was a general warrant and was unlawful. The district court disagreed and denied the motion to suppress. The court briefly noted that the investigating officers used the data from the search for the limited purpose of connecting Facebook messages to the events of November 12, 2019.

Then, on October 1, 2021, Huggins' new attorney, Kevin Shepherd, filed a motion in limine to preclude the State from presenting evidence of cellphone data, text messages, and Facebook communications without establishing authenticity and reliability. In this motion, Shepherd argued the State had failed to establish a proper foundation for the Facebook evidence. He asserted the State had the burden of authenticating the origin of the Facebook messages.

The district court granted the motion in part: it held that the State would have to establish the authenticity and reliability of the Facebook communications before the evidence would be admitted.

At trial, when the State began to offer evidence of the Facebook communications, Huggins objected through his trial attorney, James Spies. Spies objected to the Facebook messages based on hearsay and because the law enforcement witness was "not a records custodian for Facebook" and was "not in the position to testify as to the accuracy of the information," resurrecting Shepherd's foundational objection. Spies informed the court that "there was pretrial litigation on this matter. I would, you know, raise the same arguments raised in those motions previously filed. I think they were actually filed by Mr.

17

Shepherd, but nonetheless, I adopted *them* as my own and I would reassert those arguments." (Emphasis added.)

The court rejected the hearsay argument, which is not at issue here. Then the district court addressed the objection in terms of foundation and made no mention of the particularity issue.

On appeal, Huggins challenges the admissibility of the Facebook messages based on the warrant through which they were obtained. He asserts neither foundational nor hearsay concerns. Those were the concerns that he specifically argued to the district court at trial and which the district court specifically addressed. He also obliquely referred to pretrial motions, specifying motions filed by Kevin Shepherd. But Shepherd did not challenge the legality of the warrant.

Huggins asks this court to review an issue that he did not preserve below by failing to renew at trial his initial particularity objection.

Because a court may change its pretrial ruling as the case unfolds, a party must contemporaneously renew its pretrial objections during trial. See *State v. Showalter*, 318 Kan. 338, 363, 543 P.3d 508 (2024). When the district court grants or denies a motion in limine and the evidence is introduced at trial, the moving party must follow K.S.A. 60-404 and make a timely and specific objection to the admission of the evidence to preserve the issue for appeal. See *State v. Miller*, 308 Kan. 1119, 1166, 427 P.3d 907 (2018). There is no question that Spies' objection was timely, but it was hardly specific if it was somehow intended to include Conwell's motion. Spies made no mention of problems with the warrant, and he did not direct the court's attention to Conwell's motion. At best, he may have been hoping the court would remember the much earlier motion and the ruling on it.

As the contemporaneous objection was presented, the court would have had no reason to reaffirm its ruling on the warrant. In denying Spies' objection at trial, the court made no mention of the legality of the warrant. Furthermore, Spies did not specify or even suggest some other grounds for suppression or ask the court to expand on its ruling to include Conwell's grounds for suppression. Cf. *State v. Robinson*, 303 Kan. 11, 63, 363 P.3d 875 (2015) (when defendant considers findings insufficient for appellate review, defendant has obligation to seek more complete explanation of rulings); *McIntyre v. State*, 305 Kan. 616, 618, 385 P.3d 930 (2016) (litigants bear responsibility for objecting to inadequate findings and conclusions so the trial court may correct such inadequacies; failure to object to the adequacy of the rulings precludes appellate review).

Huggins argued one reason for suppression at trial and hopes the language of his objection was sufficiently vague to preserve a different basis for appeal. This defeats the statutory requirement for specificity, and it leaves trial courts guessing what the grounds for an objection may be. We are disinclined to retreat from our long-held position that a party must state to the trial court the basis for an objection. And Huggins does not contend that any exceptions to the contemporaneous objection rule apply to his situation.

Because the issue of the particularity of the search warrant was not set out to the court at trial, we will not address it on appeal. See, e.g., *State v. Hillard*, 313 Kan. 830, 839, 491 P.3d 1223 (2021).

*Prosecutorial Error Based on Comment on Witness Credibility*

Huggins contends for the first time on appeal that the prosecutor improperly commented on and bolstered the veracity of a witness for the State during closing

19

argument. He argues this commentary is grounds for reversing his convictions. We disagree.

Claims of prosecutorial error are reviewable on appeal even if they were not preserved below. *State v. Haygood*, 308 Kan. 1387, 1397, 430 P.3d 11 (2018). In determining whether a prosecutor engaged in erroneous conduct, this court considers whether the challenged acts "fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

On the day of the shootings, Shane Kendall was working on remodeling a house next door to where O.H. lived. He testified at trial that he was outside preparing to use a saw when he observed the youths show up at O.H.'s house, go to the door, push their way in, and a short time later, engage in gunfire.

In closing argument, the prosecutor made the following comments about Kendall's testimony:

> "The other evidence, including the testimony from Shane Kendall. Shane Kendall testified that he saw these people on the porch push their way into the house. *Shane Kendall's got no dog in this fight. Why would he come in here and testify to you that he saw that if he didn't see it?*" (Emphasis added.)

Huggins contends the prosecutor improperly commented on the truthfulness of Kendall's testimony. Caselaw suggests otherwise, however.

Prosecutors have broad latitude in crafting their arguments and drawing reasonable inferences from the evidence, but telling the jury that a witness told the truth falls outside

that broad latitude. *State v. Jordan*, 317 Kan. 628, 648, 537 P.3d 443 (2023). This is because such comments constitute improper testimony, not commentary on the evidence of the case. State v. *Gulley*, 315 Kan. 86, 95, 505 P.3d 354 (2022). See, e.g., *State v. Elnicki*, 279 Kan. 47, 64, 105 P.3d 1222 (2005) (improper to call defendant a liar and comment "'the truth shows you beyond a reasonable doubt the defendant is guilty'"); *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000) (improper to repeatedly tell jury defendant and defendant's counsel had lied without connecting it to evidence); *State v. Akins*, 298 Kan. 592, 607, 315 P.3d 868 (2014) (improper to say witnesses or their statements were not credible).

Kansas cases distinguish between arguments expressing an opinion about a witness' credibility and arguments discussing legitimate factors a jury may consider in assessing credibility. The former falls outside the bounds of proper argument while the latter does not. *Jordan*, 317 Kan. at 648.

One factor a jury may consider in assessing witness credibility is a witness' motive to be dishonest. *Jordan*, 317 Kan. at 649. This court has approved of a prosecutor's use of rhetorical questions to encourage a jury to consider whether a witness had a motive to be untruthful. *State v. Ortega*, 300 Kan. 761, 777, 335 P.3d 93 (2014). And "[p]rosecutors may comment on a witness' lack of motivation to be untruthful but must base these comments on the evidence and reasonable inferences from the evidence without stating their own personal opinion concerning the witness' credibility." *State v. Hachmeister*, 311 Kan. 504, 519, 464 P.3d 947 (2020).

In *Hachmeister*, we considered a prosecutor's comments in closing argument that several witnesses "ha[d] no skin in the game. They've got no agenda." 311 Kan. at 519. We concluded the comments were valid considerations for the jury to consider, holding:

21

"The prosecutor made these comments so the jury could examine whether the witnesses here had a motive to lie—a valid consideration in weighing credibility. Further, the prosecutor did not inject any personal opinion into these statements. Rather, the prosecutor made a reasonable inference that these witnesses lacked a motive to lie given their peripheral connection to Hachmeister. Accordingly, the prosecutor's statements were within the wide latitude allowed the State when discussing evidence." *Hachmeister*, 311 Kan. at 520.

In *Hachmeister*, we cited to *Ortega*, where this court considered the comments of a prosecutor who reminded the jury it would have to judge the credibility of witnesses and then argued to the jury:

"What reason do they have to lie to you? Perhaps somebody who might think, well, police officers do this all the time. I don't necessarily know why you would think that, but that's the most cynical possible thing I can think of. Well, set that aside. Do middle school secretaries come into court and lie all the time? Did Ms. Perez or Ms. Delarosa, the principal, have a reason to come in here and tell you that the defendant did something or said something that she didn't really do?" *Ortega*, 300 Kan. at 775.

We found that "the prosecutor's statements were based on reasonable inferences drawn from the evidence, and the prosecutor was merely explaining what the jury should look for in assessing the credibility of the school officials." *Ortega*, 300 Kan. at 775.

Similarly, in *Jordan*, the prosecutor told the jury: "'Ask yourself, what motivation does Ms. Cunningham have to not be truthful about that particular fact? I submit to you that there's absolutely no reason. What did she have to gain from that?'" *Jordan,* 317 Kan. at 648. The court considered the broad context of the prosecutor's argument and found "the prosecutor's statement suggesting Cunningham had no motive to lie was made within a larger discussion about legitimate factors bearing on witness credibility and how those factors related to the trial evidence." 317 Kan. at 650. We concluded that "by tying her

22

comment to the evidence and to legitimate factors bearing on witness credibility, her argument fell just within the wide latitude afforded prosecutors in closing argument, even if by only the slightest margin." 317 Kan. at 650-51.

Here, the prosecutor stated: "Shane Kendall's got no dog in this fight. Why would he come in here and testify to you that he saw that if he didn't see it?" This argument that the witness was a neutral bystander lacking motivation to manipulate the truth is akin to the comments at issue in *Hachmeister*, *Jordan*, and *Ortega.* We found no error in those comments, and we also find no error in the prosecutor's statement here.

*Cumulative Error*

Huggins urges us to apply cumulative error analysis, but we find no errors to aggregate. The cumulative error rule does not apply if there are no errors or only a single error. *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021).

*BIDS Fees*

At sentencing, the court ordered Huggins to make various payments for costs associated with his trial and other fees:

> "The [c]ourt would direct that you pay court costs in the amount of $171 and a $22 surcharge fee. There would be a $200 DNA database fee. The [c]ourt would waive the BIDS application fee. The [c]ourt would impose a significantly reduced attorney fee in the amount of $2,500. That would be for indigency found. The [c]ourt would direct that you begin paying this in the amount of $15 per month, beginning on December 1, 2022. You will be getting some income once you're in prison if you're able to work."

When a district court imposes liability for expenditures for counsel and other defense services, K.S.A. 22-4513(b) requires the court to consider both the financial resources of the defendant and the nature of the burden that payment of such sum will impose. The sentencing court must state on the record how those factors weigh in the court's decision. *State v. Robinson*, 281 Kan. 538, 546, 132 P.3d 934 (2006).

Here, the court failed to consider on the record Huggins' financial resources or his ability to pay the fees. We therefore vacate the imposition of defense fees and remand the case to the district court to reassess Huggins' attorney fees.

CONCLUSION

We find no trial errors and affirm the convictions. We vacate the imposition of fees and remand for reconsideration of those fees.

Affirmed in part, vacated in part, and remanded with directions.