NOT DESIGNATED FOR PUBLICATION

No. 126,387

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

MYDERIA ANN KATHRYN CASTEEL,
*Appellant.*

MEMORANDUM OPINION

Appeal from Greenwood District Court; JANETTE L. SATTERFIELD, judge. Submitted without oral argument. Opinion filed May 29, 2026. Affirmed in part, vacated in part, and remanded with directions.

*Caroline M. Zuschek* and *Hope Faflick-Reynolds*, of Kansas Capital Appellate Defender Office, for appellant.

*Natalie Chalmers*, principal assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before PICKERING, P.J., CLINE, J., and CAREY L. HIPP, District Judge, assigned.

PICKERING, J.: Myderia Casteel was charged with identity theft, interference with law enforcement, and driving without a license following a traffic stop. She moved to suppress the evidence obtained during the stop, which the district court denied. Casteel now appeals the court's denial of her motion to suppress as well as the assessment of $100 Board of Indigent Defense Services (BIDS) attorney fees. After a thorough review, we find the district court did not err by denying the motion to suppress but erred by finding that evidence of speeding, standing alone, was insufficient to justify the stop. And we find the district court failed to consider Casteel's financial resources before imposing

1

$100 in BIDS attorney fees. Thus, we affirm the denial of Casteel's motion to suppress, vacate the order of BIDS attorney fees, and remand for consideration of that issue.

FACTUAL AND PROCEDURAL BACKGROUND

On the evening of February 13, 2021, Deputy Taylor Cordell observed a car traveling eastbound in a construction zone. Because Deputy Cordell believed the car was speeding, she asked Sergeant Michael Cordell to check the car's speed with radar. Dispatch advised that one of the owners of the vehicle had a suspended license. After passing Sergeant Cordell, Deputy Cordell attempted to "pace" the vehicle and discovered the driver was behaving very cautiously by reducing the vehicle's speed between three and five miles below the speed limit. Deputy Cordell initiated a traffic stop.

The driver of the vehicle gave Deputy Cordell a name and date of birth but did not have her driver's license on her. When Deputy Cordell pulled up the license in her system, the license's photo did not match the driver's appearance. The deputy noted the licensee portrayed in the photo appeared "much older" than the driver. The deputy also noted the driver's and licensee's eye colors did not match. Eventually, the driver stated she did not have a valid license and provided her ID that listed her name as Myderia Casteel. She had earlier given her mother's name to the deputy.

The State charged Casteel with identity theft, interference with law enforcement, and driving without a license.

At the preliminary hearing, Sergeant Cordell testified that he was running radar and "pick[ed] up" Casteel's vehicle. Sergeant Cordell stated that "there were two vehicles that were in my radar cone at the time. Both were in excess of the speed limit and it was going back and forth, between the vehicles. I believe it was within one mile an hour of each other." Although he could not identify which vehicle was going which speed, both

2

were traveling faster than the speed limit. Sergeant Cordell assisted with the traffic stop and determined the driver's license photo for the name given did not match the driver of the vehicle. On cross-examination, Sergeant Cordell acknowledged that Casteel was not cited for speeding. But she was travelling at approximately 34 miles per hour in a 30-mile-per-hour zone.

Deputy Cordell testified that she was drawn to the vehicle because "it was driving overly cautious doing unusual things." She also indicated that the vehicle appeared to be travelling faster than the speed limit. When she pulled the vehicle over, the driver did not have her license on her. Ultimately, Deputy Cordell determined Casteel had given her mother's name. Deputy Cordell also acknowledged that, despite the vehicle travelling 33 or 34 miles per hour, no citation for speeding was given. She testified that dispatch identified a male owner of the vehicle as the suspended owner.

Casteel moved to suppress. Specifically, she argued that the stop was improper because the vehicle's registered owner's license was suspended, not revoked. She asserted that *Kansas v. Glover*, 589 U.S. 376, 381, 140 S. Ct. 1183, 206 L. Ed. 2d 412 (2020), held only that a registered owner with a revoked license provided reasonable suspicion that a driver was driving in violation of the law. She also contended that driving under the speed limit was not illegal and that Sergeant Cordell's report that the car was speeding was insufficient to form reasonable suspicion because "Sergeant Cordell took no action following his observation."

The district court held a hearing on Casteel's motion to suppress. Before testimony, the district court asked whether Sergeant Cordell "clock[ed] her speeding in a construction zone" and specifically asked if radar was involved because "[y]ou can't really pace a car at 30 miles an hour in a construction zone." The district court noted that "no ticket was written for speeding" and questioned whether "that's a sufficient traffic

3

violation when no speeding [ticket] was written." The district court concluded that "this is purely a driver's license stop."

After hearing argument, but before testimony, the district court stated:

"I think it's really important that we have a very clear record. And that includes so that they know whether, you know, there is a speeding ticket here that's serious enough that supports the stop irrespective of the issue of the suspension, or if the real stop was for a suspension and done so based on *Glover*."

Sergeant Cordell testified that he was able to "catch" the defendant's vehicle on his radar. He again acknowledged that there were two vehicles within his radar cone but noted that those vehicles were Casteel's and Deputy Cordell's. He explained that radar indicated the speed was varying between 33 and 34 miles an hour, but it was difficult to tell which vehicle was driving which speed, or whether both vehicles were driving at the same speed which varied between 33 and 34 miles an hour. Sergeant Cordell testified that he observed this speed within a 30-mile-per-hour construction zone.

Deputy Cordell testified that she followed Casteel's vehicle and asked Sergeant Cordell if he could get a speed for the vehicle. She explained that she did not attempt to pace the vehicle until after they passed Sergeant Cordell. When she paced the vehicle, it was going between three and five miles under the speed limit.

After the State rested, Casteel recalled Deputy Cordell. She explained that dispatch informed her that one of the owners of the vehicle had a suspended driver's license. She testified that she stopped the vehicle for two reasons:  speeding and one of the owners of the vehicle had a suspended license. She also testified that, after passing Sergeant Cordell, the vehicle slowed down to between three and five miles under the speed limit.

4

Casteel received new counsel after her initial counsel had to withdraw for health concerns. Casteel's new counsel supplemented the motion to suppress, reiterating and expanding on the arguments made in the original motion to suppress. The supplement to the motion to suppress argued that there was sufficient evidence to negate an inference that the driver of the vehicle was operating the vehicle with a suspended license.

On July 14, 2022, the district court held a hearing to announce its ruling. It noted that it must consider the totality of the circumstances, starting with the observation of speeding, "albeit three or four miles over the speed limit." The district court also believed the later observation that the vehicle was traveling "considerably" below the speed limit "drew suspicion to the vehicle." The district court explained that "[n]either one of those things alone are probably sufficient." But when combined with the fact that one of the owners of the vehicle had a suspended license, the court found that "reasonable suspicion was [met]."

The district court's written order denied the motion to suppress, and the case proceeded to a bench trial on stipulated facts. Casteel renewed her objection to the admission of any evidence obtained during the traffic stop, and the district court overruled the objection. The court found Casteel guilty of identity theft, interference with law enforcement, and driving without a license.

The district court sentenced Casteel to 8 months' imprisonment for identity theft, suspended the sentence, and imposed 18 months' probation. For interference with law enforcement, the district court sentenced Casteel to 6 months in jail, suspended the sentence, and imposed 18 months' probation. The district court ran these two sentences concurrently. Finally, for driving without a license, the district court sentenced Casteel to 90 days in jail, suspended the sentence, and placed her on 18 months' probation. The district court ran the sentence for driving without a license consecutive to Casteel's other sentences.

5

Casteel appealed.

ANALYSIS

I.      *The District Court Did Not Err When It Denied Casteel's Motion to Suppress, But Its Reasoning Was Flawed*

*Standard of Review*

On a motion to suppress, an appellate court generally reviews the district court's findings of fact to determine whether they are supported by substantial competent evidence and reviews the ultimate legal conclusion de novo. *State v. Garrett*, 319 Kan. 465, 469, 555 P.3d 1116 (2024). Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. Smith*, 312 Kan. 876, 887, 482 P.3d 586 (2021). It "does not require evidence to *prove* a fact; rather, it simply requires evidence to sufficiently *support* the fact-finder's conclusion." *State v. Morley*, 312 Kan. 702, 712, 479 P.3d 928 (2021). When determining whether substantial competent evidence exists, an appellate court must not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *Garrett*, 319 Kan. at 469.

*Discussion*

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. "In order for a law enforcement officer's seizure of a citizen to be constitutionally valid, the officer must know of specific and articulable facts that create a reasonable suspicion the seized individual is committing, has committed, or is about to commit a crime or traffic infraction." *State v. Jones*, 300 Kan. 630, Syl. ¶ 1, 333 P.3d 886 (2014).

6

"Reasonable suspicion . . . requires a showing of considerably less than a preponderance of the evidence, but the Fourth Amendment to the United States Constitution requires at least a minimal level of objective justification." *State v. Coleman*, 292 Kan. 813, 817, 257 P.3d 320 (2011). To satisfy a reasonable suspicion standard, the officer "'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *State v. Bates*, 316 Kan. 174, 183, 513 P.3d 483 (2022). "The reasonable suspicion inquiry 'falls considerably short' of 51% accuracy." *Glover*, 589 U.S. at 381.

On review, the appellate court reviews de novo "the totality of the circumstances to determine whether reasonable suspicion exists" and the stop is justified. *Jones*, 300 Kan. at 632. "The totality of the circumstances standard precludes a 'divide-and-conquer analysis' under which factors that are 'readily susceptible to an innocent explanation [are] entitled to "no weight."'" *Coleman*, 292 Kan. at 818. Instead, "a reviewing court should employ common sense . . . and should accord reasonable deference to a law enforcement officer's ability to distinguish between innocent and suspicious actions." 292 Kan. at 818.

The district court's journal entry for the suppression hearing does not contain any findings of fact or conclusions of law. Instead, the district court's order states that it "has reviewed the motion to suppress, the State's response and the supplement to motion to dismiss" and that the district court "denie[d] the motion to suppress." Before filing the journal entry, however, the district court held a hearing in which it announced its ruling from the bench. It stated in part:

> "The Court believes it must rely on the *Glover* case. . . . Within the opinion, it is emphasized that the analysis for the detention—the stop—the detention, and the Fourth Amendment implications thereto, are to totality of the circumstance analysis. And all of the information available to the officer at the time of the stop. Starting with albeit three or four miles over the speed limit is speeding and that observation.

7

"The Court, I think, commented at some point about being locked in but, I think that the—the more general statement that has been made with regard to the speeding is was the radar used? And by testimony of Deputy—Mr. Deputy Cornell [*sic*] the speeding was picked up on the radar, again, albeit, no particular vehicle was locked in, but Sergeant Codell [*sic*]—Cordell, viewed the vehicle traveling in excess of the speed limit. In combination with that, there was later observation that the vehicle was traveling below the speed limit, considerably, and acting in a manner that drew suspicion to the vehicle.

"Neither one of those things alone are probably sufficient. But in combination, and more importantly, in combination with the fact that in running the registration of the vehicle, it indicated that the owners of the vehicle, or an owner of the vehicle had a suspended license. That leads us directly to *Glover*. And my obligation is to follow *Glover*. And in that, I think, the only opinion that matters is the majority opinion. And clearly in *Glover*, if the Court—if the officer was essentially acting in good faith, and there was nothing to negate his belief that there was a driver in a vehicle where the owner was suspended to be able to stop the vehicle. That that was not a violation of the Fourth Amendment. And that under all of the circumstances, reasonable suspicion was [met].

"Emphasizing reasonable suspicion is lower than preponderance, it's lower than probable cause. And that one could make, including officers, reasonable assumptions, and draw reasonable inferences. I did not view, in the *Glover* opinion, that it—in the majority opinion—distinguished sufficiently, between a revoked and a suspended, an administrative suspension, and that could mean somebody is not a habitual driver. And they may not even be aware their license is suspended. That was—the word suspended and revoked were used in one sentence. And so, I don't—although, there may be a legal distinction in Kansas, and there may be a further splitting of hairs in that regard. I don't think that the majority opinion split those hairs.

"And so, the reasonable suspicion standard for initiating an investigative traffic stop, depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

"Again, does—this Court is not making a ruling that someone that is driving very cautiously under the speed limit is engaging in illegal activity by any stretch of the imagination. Or that the—the circumstances surrounding the notation of the speeding, necessarily, in and of itself warranted the stop. But I think the combination of all three, gave sufficient, reasonable suspicion that criminal activity or an infraction—a vehicle

infraction, had occurred or was occurring. And then the result of that stop, quickly turned into a situation where officers questioned her representations and identification of herself, which is required in a traffic stop with the driver.

"And, of course, she was, in fact, suspended. But, that—that is just sort of a side note. All right.

"So the Court is denying the motion to suppress."

On appeal, Casteel argues *Glover* found that an officer had reasonable suspicion only if the officer learned that the registered owner had a revoked driver's license and believed that the owner was the driver of the vehicle. She then asserts *Glover* is inapplicable for two reasons: (1) "That one owner of a car has a *suspended* license does not provide officers with reasonable suspicion to stop that car" and (2) that once the officers learned a woman was driving—and the registered owner with a suspended license was a man—reasonable suspicion necessarily "dissipated."

The State does not address Casteel's arguments. Instead, the State contends that the district court made an error of law when it found that evidence of Casteel's speeding, alone, was insufficient to warrant the stop. It argues that, because Casteel was speeding, there was reasonable suspicion to support the traffic stop. The State similarly argues that, "at worst," the officers made a reasonable mistake of fact and, therefore, Casteel's Fourth Amendment rights were not violated. Under either circumstance, the State asserts that the district court was right for the wrong reason.

In her reply brief, Casteel argues that the district court did not find—as a matter of law—that driving 3-4 miles per hour over the speed limit was insufficient justification for a traffic stop; instead, the district court concluded that—as a matter of fact—"the State's evidence regarding the officer's purported knowledge of the speed of [Casteel's] car was inadequate, in this particular case," to justify the stop. Casteel suggests the district court "found, as a matter of fact, that the officers had only a mere hunch" she was speeding.

9

Review of this issue is somewhat stymied by the district court's failure to include findings of fact and conclusions of law in its journal entry of the suppression hearing. But, contrary to Casteel's assertions, the district court found Casteel was speeding. During its ruling from the bench, the district court began by acknowledging it must view the totality of the circumstances, "[s]tarting with albeit three or four miles over the speed limit is speeding and that observation." It also recognized that Sergeant Cordell testified he viewed the vehicle traveling in excess of the speed limit.

Substantial competent evidence supports those findings. Sergeant Cordell testified he was doing traffic enforcement and running radar on February 13, 2021. He caught Casteel's vehicle and Deputy Cordell's vehicle in his radar cone. Sergeant Cordell testified he was unable to determine the speed of each individual vehicle, but each vehicle was traveling at 33 or 34 miles per hour in a 30-mile-per-hour zone. He explained, "So it's possible that one of the two vehicles was 33 and one was 34 and it was alternating between the two. But it's also likely that it—that they were driving about the same speed and it was just alternating between those two speeds."

Despite the argument in Casteel's reply brief, the district court did not seem to question the validity of the officers' testimony regarding speeding—though it would have appreciated more concrete evidence of speeding. Instead, the district court seemed preoccupied with whether speeding was a pretext for the stop. In its ruling from the bench, the district court questioned whether the "circumstances surrounding the notation of the speeding, necessarily, in and of itself *warranted the stop*." (Emphasis added.) Similarly, during the motion to suppress hearing, the district court had pressed the State on whether radar was used to confirm the speed and questioned whether Deputy Cordell could "pace" a vehicle traveling only a few miles over the speed limit. The district court explained, "I'm not sure that that's *a sufficient traffic violation* when no speeding [ticket] was written." (Emphasis added.) The district court added that it was important to have a clear record, stating, "And that includes so that they know whether, you know, there is a

10

speeding ticket here *that's serious enough that supports the stop irrespective of the issue of the suspension, or if the real stop was for a suspension and done so based on* Glover." (Emphasis added.)

Whether the allegation of speeding supported the stop is a legal argument. Indeed, "[a] traffic violation provides an objectively valid reason to effectuate a traffic stop, even if the stop is pretextual." *State v. Anderson*, 281 Kan. 896, 901, 136 P.3d 406 (2006). Driving even a minimal amount over the speed limit is speeding and is a traffic infraction. See K.S.A. 8-2116(a); K.S.A. 8-2118(c).

Here, the district court found that Casteel was speeding. Based on this fact alone, the initial stop was lawful. See *Anderson*, 281 Kan. at 901. The district court erred when it concluded that this fact, standing alone, was insufficient to justify the traffic stop. But the district court did not err when it ultimately denied the motion to suppress. Thus, we affirm as right for the wrong reason. See *State v. Noyce*, 301 Kan. 408, 411, 343 P.3d 105 (2015).

II. *The District Court Erred When It Imposed BIDS Fees Without Considering Casteel's Financial Resources or the Burden that Repayment Would Impose*

*Standard of Review and the Rules We Follow*

Before a district court imposes BIDS attorney fees, "Kansas law requires that the district court explicitly consider on the record the nature of the burden such payment would impose on the defendant. See K.S.A. 22-4513(b)." *State v. Anderson*, 318 Kan. 425, 427-28, 543 P.3d 1120 (2024). The remedy for a sentencing court's failure to make explicit findings is to vacate the BIDS attorney fees and remand for reconsideration of such findings. 318 Kan. at 444.

The amount of BIDS attorney fees imposed is reviewed for an abuse of discretion. *State v. Buck-Schrag*, 312 Kan. 540, 555, 477 P.3d 1013 (2020). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Younger*, 320 Kan. 98, 137-38, 564 P.3d 744 (2025).

*Discussion*

On appeal, Casteel contends the district court did not consider her financial resources or the burden that repayment of BIDS attorney fees would impose on her. Instead, she asserts that the district court simply asked whether she was employed and, upon learning that she got paid for taking care of her uncle, assessed the $100 BIDS attorney fees. She requests that we vacate the BIDS fees and remand to the district court for appropriate consideration of this issue. While the district court ordered her to pay the $100 BIDS application fee as well, Casteel challenges only the amount she was ordered to pay in BIDS attorney fees.

The State argues the district court inquired as to whether Casteel had any income and where she was living. And the State correctly notes the district court "showed leniency towards her limited employment by only imposing a $100 fee." The State acknowledges "the inquiry could have been more robust" but contends the district court's inquiry was sufficient.

To support its argument, the State relies on *Buck-Schrag*, where the district court ordered Buck-Schrag to pay $7,000 in attorney fees after sentencing him to life in prison with a minimum term of 586 months' imprisonment. The State initially requested $9,500 in attorney fees, but the district court reduced the fee, stating: "'The Court is aware that Mr. Buck-Schrag is able-bodied. The Court believes that he will be employable and employed and given a job within the prison system.'" 312 Kan. at 555. The district court

concluded that "'even the higher amount suggested by the State is an amount that is reasonable recognizing resources, recognizing burden.'" 312 Kan. at 555. The Kansas Supreme Court affirmed the order for attorney fees because the district court found that the amount was "reasonable based on Buck-Schrag's resources and burden. This indicate[d] that the court considered the financial burden attorney fees would place on Buck-Schrag." 312 Kan. at 556.

The State's reliance on *Buck-Schrag* here is not persuasive. First, the district court here did not consider Casteel's employment and living situation during its assessment of BIDS attorney fees, although it considered this information when setting the conditions of Casteel's probation. The record contains no information about the amount of income Casteel receives.

Rather, we find *State v. Owens*, No. 125,919, 2024 WL 1005577 (Kan. App. 2024) (unpublished opinion), analogous to this case. There, Owens moved to waive the BIDS attorney fees for several reasons, including his present indigency which qualified him for a public defender; the low wages earned in prison; and the remainder of his "meager resources" would be consumed while in prison. 2024 WL 1005577, at *1. Defense counsel asked the court to "'make *State v. Robinson* findings and waive any further costs[.]'" 2024 WL 1005577, at *1. The district court, however, denied his request. Instead, the district court relied on Owens' ability to earn wages in prison as the basis for ordering Owens to pay $975 in BIDS attorney fees. The district court did not inquire as to the burden that $975 repayment would impose on Owens. On appeal, the *Owens* panel found the district court's analysis lacking, stating: "[E]vidence of a defendant's employability is not enough to satisfy the district court's obligations under *Robinson*." 2024 WL 1005577, at *3. Accordingly, the panel vacated the BIDS attorney fees and remanded for further proceedings. 2024 WL 1005577, at *3.

Similarly, the closest the district court came to inquiring about Casteel's income was when it reviewed the conditions of Casteel's probation. Immediately before asking if Casteel worked, the district court explained the standard conditions of probation. It informed her she must "[m]aintain and gain employment" and then asked if she was working. When Casteel informed the district court she took care of her uncle, the court asked if she was paid for that care, and she replied affirmatively. The district court's inquiry was focused on whether the care she provided to a family member was a legal source of income. The court continued by advising Casteel she must notify her probation officer of changes to employment, living situation, or phone number, and she was not allowed to have contact with the victim in the case.

The district court then ordered a $200 DNA database fee, supervision fees, and the $100 BIDS application fee. It continued, "I'm going to assess another $100 for court—or for attorney's fees. You can make payments. In fact, you have to make payments to be successfully discharged from probation." At no point in the discussion of costs did the district court consider Casteel's financial circumstances or the burden paying those fees would impose on her.

Second, *Buck-Schrag* discusses the district court's findings but does not identify the information on which the court based those findings. 312 Kan. at 556. In *State v. Robinson*, 281 Kan. 538, 545, 132 P.3d 934 (2006), our Supreme Court held that, when assessing BIDS fees, the court "must consider the financial resources of the defendant and the nature of the burden that payment will impose *explicitly*, stating on the record how those factors have been weighed in the court's decision." Simply finding a defendant is employable is insufficient analysis. *State v. Wade*, 295 Kan. 916, 927, 287 P.3d 237 (2012). The holding in *Robinson* would become meaningless if all a district court must state, on the record, is that the defendant has a job with no other consideration of the defendant's financial circumstances.

14

The fact the district court ordered only $100 in BIDS attorney fees is insufficient to show the district court considered Casteel's financial circumstances and the burden the fee would impose. See *State v. Huggins*, 319 Kan. 358, 376, 554 P.3d 661 (2024) (remanding for reconsideration of BIDS fees because, even though district court ordered defendant to pay reduced BIDS fee after finding defendant indigent, "the court failed to consider on the record Huggins' financial resources or his ability to pay the fees"). Without further inquiry by the district court, we are left to guess if Casteel has the ability to pay the $100 in attorney fees.

The district court here did not explicitly consider Casteel's financial circumstances or consider the burden that imposing BIDS fees would cause. It did not comply with K.S.A. 22-4513(b) or *Robinson*. We vacate the BIDS attorney fees order and remand for further proceedings.

Affirmed in part, vacated in part, and remanded with directions.